Argued and submitted November 8, 2013, accused is suspended from
practice of law for 90 days, commencing 60 days from date of filing of
decision August 21, 2014

In re Complaint as to the Conduct of

## DANIEL J. GATTI,
*Accused.*

(OSB No. 1060; SC S061105)

333 P3d 994

Mark J. Fucile, Fucile & Reising LLP, Portland, argued
the cause and filed the briefs for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Tigard,
argued the cause and filed the brief for the Oregon State
Bar.

Peter R. Jarvis, Portland, filed a brief for *amicus curiae*
Peter R. Jarvis.

------------

Before Balmer, Chief Justice, and Walters, Landau, Brewer, and Baldwin, Justices.**

PER CURIAM

---

** Kistler and Linder, JJ., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged Daniel J. Gatti (the accused) with violating the Rules of Professional Conduct (RPC). The Bar's charges were set out in five causes of complaint, all of which arose as a result of settlements that the accused had brokered for a group of clients—all sexual abuse victims—in civil actions brought against the Portland Archdiocese, the State of Oregon, and Father Michael Sprauer.

In January 2013, a disciplinary trial panel determined that the Bar had proved three of the five causes of complaint and that, in engaging in that conduct, the accused had violated four ethical rules—RPC 1.4(b) (failing to explain matters to the extent reasonably necessary to allow clients to make informed decisions), RPC 1.7(a)(1) (failing to secure clients' informed consent before engaging in representation that constituted a current conflict of interest), RPC 1.8(g) (failing to secure clients' informed consent before participating in aggregate settlement of their claims), and RPC 8.4(a)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflected adversely on fitness to practice law). The trial panel did not address the remaining two causes of complaint, but concluded that the accused should be suspended from the active practice of law for six months.

The accused now seeks review of that decision. We review the trial panel determinations *de novo*. ORS 9.536(2); BR 10.6. For the reasons that follow, we conclude that (1) the Bar met its burden of proof with respect to the three causes of complaint addressed by the trial panel and that the accused violated three of the four rules of professional conduct set out above—RPC 1.4(b), RPC 1.7(a)(1), and RPC 1.8(g); (2) the Bar did not prove that the accused violated RPC 8.4(a)(3); and (3) the accused should be suspended from the practice of law for 90 days.

### FACTS

The following facts are undisputed. During the period roughly spanning 2001 through 2007, the accused represented 15 clients (the *Sprauer* plaintiffs) in joint actions

brought against the Portland Archdiocese and the State of Oregon for the actions of Father Michael Sprauer.[1] All of the *Sprauer* plaintiffs—among them, Earl New, the complainant in this disciplinary matter—had several things in common: At various times, all had been incarcerated at the MacLaren Home for Boys, a facility for juvenile offenders, and all alleged that, while there, they had been sexually molested by Sprauer, the facility's chaplain.

At the outset of the *Sprauer* litigation, the accused sent each of the 15 plaintiffs a letter setting out the pros and cons of joint representation and advising them to obtain independent legal advice about whether to have the accused represent them jointly. The accused also provided the plaintiffs with a Joint Representation and Prosecution Agreement (JRA), which they all signed. Among other things, the agreement set out the terms under which the accused would pursue settlement of his clients' claims and addressed his clients' rights and responsibilities in the event that the opposing parties proposed an "aggregate or joint fund" settlement. Specifically, the agreement provided:

> "5.2.   Client and Attorneys agree that it is generally desirable to conduct settlement negotiations on an individual client basis and will endeavor to do so, with each client's case negotiated separately, based on its own strengths and weaknesses, and not linked to the settlement of any other client's case. No client may interfere with any other client's right to settle. However, client recognizes that it is possible that an aggregate settlement might be in plaintiff's interest, with a single lump sum fund to be shared by all clients, or a joint-fund settlement, with a lump sum to be shared by two or more clients. * * *

> "5.3.   In the event of an aggregate or joint-fund settlement, the participating clients may decide among themselves as to how the fund shall be allocated. An allocation may not be imposed on any client, except by Arbitration under Section 6 of this Agreement. Attorneys shall have no role whatsoever in the allocation decision, and shall not represent any client in that process. Client may, however,

---

[1] Sprauer was a defendant in those actions, and the plaintiffs settled their claims against him when they settled their claims against the Archdiocese and the state.

be represented by other counsel. If the participating clients cannot decide upon an allocation, the allocation decision shall be submitted to final and binding arbitration as provided in Section 6 of this Agreement."

In July 2004, the *Sprauer* plaintiffs' litigation was halted while the Archdiocese filed for bankruptcy protection. In 2005, at the bankruptcy court's direction, the *Sprauer* plaintiffs and the Archdiocese began a series of mediation meetings. In anticipation of those meetings, the accused sent his clients a letter addressing the conflict that would arise if the Archdiocese assets were less than the total value of the *Sprauer* plaintiffs' claims:

"The Oregon attorney ethics rules are clear that when the defendant's assets exceed the total value of all claims, there is no conflict of interest. The rules are also clear that when the defendant's assets are known to be less than the total value of all claims, there is a conflict of interest. This conflict allows a lawyer or firm to represent multiple clients on common issues but prevents the lawyer or firm from representing individual clients [*vis-à-vis*] each other in deciding the relative allocation of dollars to be received by each client."

The accused also sent the plaintiffs a second letter setting out the advantages and disadvantages of joint representation and a second JRA containing provisions similar to the first. The second JRA again provided that "an aggregate settlement might be in plaintiff's interest, with a single lump sum to be shared by all clients," and that the accused would "have no role whatsoever in the allocation decision." The *Sprauer* plaintiffs also signed the second JRA.

The parties' first mediation meeting took place in September 2005, at which time the Archdiocese offered each of the *Sprauer* plaintiffs $7,500 to settle their claims. Plaintiff New was willing to accept that offer. Then, as now, New was serving a 27-year sentence based on his 1994 convictions for burglary, kidnapping, sodomy, and menacing. Acknowledging in a letter to the accused that "I'm your hardest case because a jury would not be sympathetic to me because of my charges," New indicated that he "would like to accept the offer of $7,500 and let you take the winning cases to trial." Initially, the accused did not act as New had

requested and refused to settle any of the plaintiffs' claims for the sum offered. Later, however, the accused attempted to accept the Archdiocese's $7,500 offer on New's behalf; the Archdiocese rejected that attempt as untimely.

A second mediation meeting was scheduled for the fall of 2006. In preparation for that meeting, the accused obtained individual minimum settlement offers from each of his clients. The total of those individual minimum settlement offers was $284,500.

At the mediation, the accused told the two judges who served as mediators that the plaintiffs would settle their cases for $284,500. Instead of relaying that offer to the Archdiocese, however, mediator Judge Hogan told the Archdiocese that it must pay $600,000 to settle the plaintiffs' claims. The Archdiocese agreed and Judge Hogan so informed the accused. Neither the Archdiocese nor its attorney had any role in allocating the $600,000 between the plaintiffs. After the mediation concluded, the attorney for the Archdiocese sent the accused a letter in which she listed the plaintiffs and their respective claim numbers and confirmed "that you have settled all of the above-referenced cases with the Archdiocese for the total sum of $600,000." The accused's office then informed the attorney for the Archdiocese of "plaintiffs' understanding" concerning the "settlement breakdowns" and supplied her with a list of the sums that each plaintiff should receive in settlement of his claims. In accordance with those "settlement breakdowns," the Archdiocese sent the accused individual settlement agreements and checks. Each plaintiff signed his own settlement agreement and each settlement was separately approved by the bankruptcy court. The individual settlement agreements did not make the agreement of any one plaintiff contingent on the agreement of any other plaintiff.

When later questioned by the Bar about how he had determined the "settlement breakdowns," the accused explained that, in addition to obtaining minimum settlement authority from each of his clients, he also had obtained their advance consent to disburse any sum that exceeded the total of their minimum settlement offers proportionately. The accused explained that the plaintiffs had agreed that a

plaintiff whose minimum settlement offer represented, for example, five percent of the total of the individual minimum settlement offers would receive five percent of any offer exceeding that total.

However, the accused explained, his agreement with New was different. According to the accused, New had agreed to settle his claim for a maximum of $7,500—an amount that would remain unchanged, even if the Archdiocese offered to settle for more than the total of the plaintiffs' minimum settlement offers. That $7,500 maximum was acceptable to New, the accused asserted, because (1) New was cognizant of the fact that his claim had little value as a result of his criminal history; (2) New previously had been willing to accept the same sum when the Archdiocese initially offered it; and (3) the accused had agreed not to withhold any attorney fees or costs from New's settlement. When the accused wrote to New informing him of the settlement, he stated that, "with your permission, I was able to settle your case for the $7,500 you requested. I informed you that I would not be charging you any costs or attorney fees under your unique circumstances."

After the settlement with the Archdiocese was concluded, the accused brought to trial three cases against the State of Oregon. The jury found in favor of two of the plaintiffs—R.S. and R.P.—awarding the pair $590,000 and $595,000 respectively, plus punitive damages. In the other case, the jury entered an adverse verdict, apparently as a result of a statute of limitations defense.

Following those verdicts, the accused anticipated that he would be able to settle all of the *Sprauer* plaintiffs' claims against the state, and, in June 2007, he sent each a letter stating as follows:

> "If all of you agreed to settle your cases on the same percentage basis as we did in the past, then I do not have a conflict. When the number is reached, I will need to know if I have your permission to settle for the number that I can extract from them and that you will accept your proportionate share pursuant to the proportionate share that was given in the past. In other words, if your proportionate share came to 10 percent, then you need to say you will

take the same proportionate share. If your proportionate share came to 15 percent or any number can be used, then again, I need your permission to settle for that same proportionate share once we find out what the ultimate sum will be. If any of you disagree with this proportionate share analysis, then in that event I would have to resign and I would have a conflict of interest and I would not be able to represent any of you."

New responded promptly with a letter giving the accused permission to "settle for my proportionate share," while at the same time noting that "I do not remember you mentioning anything about 10 percent or 15 percent when the Church disrespectingly [*sic*] offered a nuisance settlement on my case[.]"

In July 2007, the accused informed New by mail that he had settled with the state for a total of $1.05 million. The accused wrote that "[a]ll of you agreed that you would take the same percentage, or more if I could get it, that you accepted from the Portland Archdiocese," and went on to inform New that he could "expect to receive a check in the approximate sum of $7,500 within the next 45 days" upon executing and returning a power of attorney to the accused. New responded with a letter informing the accused that he had mailed his power of attorney and thanking the accused for his efforts. New also observed that he was "a little surprised that I only received from the State (after your win in court) the same amount as the Church offered"; he added, however, "but that's what I get for being in jail."

Pursuant to powers of attorney executed by his clients, the accused signed all of their names, save that of N.K., the client who had lost at trial, to a settlement agreement and release prepared by the state's counsel. In the letter accompanying the tender of that release, the accused explained that he had omitted N.K.'s name because he had lost at trial and therefore was not entitled to share in the settlement. The state, however, insisted that N.K. execute the document because it contained, among other things, a provision releasing the right to appeal. Without telling N.K., the accused then signed N.K.'s name to the settlement agreement and returned it to the state's counsel.

In August 2007, the state's counsel issued checks totaling $1.05 million. After depositing those funds in his trust account, the accused disbursed them to all of the *Sprauer* plaintiffs except for N.K.[2] The accused did not, however, distribute those funds according to the percentages used in the Archdiocese settlement. Instead, according to letters that the accused later wrote to the Bar, the accused divided the total settlement into two pools of funds. The first, approximately $357,676, he disbursed in two equal sums to the plaintiffs who had prevailed at trial. The second, approximately $692,323, he appears to have disbursed as follows. For the plaintiffs other than R.S., R.P., and New, the accused apparently calculated the sums that each plaintiff would receive by applying the percentages that the accused had used in distributing the Archdiocese settlement. Because R.S. and R.P. had received approximately 20 percent of the Archdiocese settlement, the other plaintiffs' percentages of the Archdiocese settlement totaled approximately 80 percent. That left approximately 20 percent of the second state pool remaining to be allocated. The method that the accused used to allocate those funds is unclear. It appears that the accused allocated additional sums to some of the plaintiffs but not to others and that he allocated $7,500 to New. On review before this court, the accused does not contend that the plaintiffs actually received the same percentage of the state's settlement as they had received in the Archdiocese settlement. When asked about that at the trial panel hearing, the accused took the position that, if "mathematical errors" were made, he was willing to correct them.

At the time that they received their settlements, none of the plaintiffs objected. Later, however, New filed a complaint with the Bar, claiming that it was prompted both by the accused's failure to respond to New's request for a detailed accounting and by the accused's "less than forthright and evasive handling of this matter."

The Bar investigation that followed spanned several years and, in September 2010, the Bar initiated disciplinary proceedings against the accused. In August 2012,

---

[2] Later, the accused paid N.K. $15,000 as a gift.

the Bar filed a Second Amended Formal Complaint alleging the following five causes of complaint:

1. By (1) continuing to represent New and the other *Sprauer* plaintiffs after the Archdiocese had offered a lump-sum settlement, and (2) deciding the amount that each plaintiff would receive from those proceeds, the accused engaged in an unwaivable current client conflict of interest that violated RPC 1.4(b), RPC 1.7(a)(1), and RPC 1.8(g).

2. By (1) continuing to represent New and the other *Sprauer* plaintiffs after the state had offered a lump-sum settlement, and (2) deciding the amount that each plaintiff would receive from those proceeds, the accused engaged in an unwaivable current client conflict of interest in violation of RPC 1.4(b), RPC 1.7(a)(1), and RPC 1.8(g).

3. By telling New that he had settled New's lawsuit against the Archdiocese for $7,500, the accused made a statement that he knew to be both false and material when he made it, thus violating RPC 1.4(b) and RPC 8.4(a)(3).

4. By settling all the *Sprauer* plaintiffs' abuse claims against the state for a lump sum without informing N.K. that he had entered into such an agreement on N.K.'s behalf, the accused withheld a material fact from N.K. that it could have significantly influenced N.K.'s decision-making processes. As a result, the accused violated RPC 1.4(b) and RPC 8.4(a)(3).

5. By failing to provide a complete and detailed accounting of the settlement funds that he had received from the Archdiocese and the state when he was asked to do so by New, the accused violated RPC 1.15-1(d).

In 2012, a Disciplinary Board trial panel conducted a hearing at which the accused was represented by counsel. The trial panel opinion addressed only the first three causes of complaint alleged by the Bar and, as noted, concluded that the accused had violated RPC 1.4(b), RPC 1.7(a)(1), RPC 1.8(g), and RPC 8.4(a)(3). The trial panel also concluded that the accused should be suspended from the practice of law in Oregon for six months. The accused appealed and now asks this court to dismiss all charges against him. Alternatively, the accused contends that a public reprimand would be a more appropriate sanction.

## ASSIGNMENTS OF ERROR

The accused's first two assignments of error are interrelated. In the first, the accused contends that the trial panel erred in concluding that he violated RPC 1.8(g) by failing to secure his clients' informed consent before participating in an aggregate settlement of their claims. In the second, the accused contends that the trial panel erred in concluding that he violated RPC 1.7(a)(1) by failing to secure his clients' informed consent before engaging in representation that constituted a current conflict of interest. The Bar contends that the requirement of securing informed consent before entering into an aggregate settlement is a "more specialized application of general conflict of interest rules to group settlement situations." We agree that the two provisions address similar issues and think it helpful, in the analysis of both provisions, to initially consider whether the interests of the plaintiffs were in conflict; we therefore begin with RPC 1.7(a)(1).

A. *RPC 1.7(a)(1)*

RPC 1.7(a)(1) provides:

"Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a current conflict of interest. A current conflict of interest exists if:

"the representation of one client will be directly adverse to another client[.]"

Paragraph (b) of the rule sets out the applicable exceptions:

"Notwithstanding the existence of a current conflict of interest under paragraph (a), a lawyer may represent a client if:

"(1)   the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

"(2)   the representation is not prohibited by law;

"(3)   the representation does not obligate the lawyer to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client; and

"(4)   each affected client gives informed consent, confirmed in writing."

As an initial matter, the accused asserts that the trial panel's one-line conclusion in its written opinion—"The Accused violated RPC 1.7(a)(1)"—is unsupported by any legal or factual analysis or explanation of the basis for the panel's conclusion. Nevertheless, because the accused recognizes that this court's review of disciplinary trial panel decisions is *de novo*, he goes on to address the evidence adduced at his disciplinary hearing and to explain why, in his view, it was insufficient to establish a violation of RPC 1.7(a)(1). The Bar's threshold premise—that the accused accepted defendants' lump-sum offers to settle and then unilaterally allocated the settlement sum among his clients—is incorrect, the accused argues, because, before accepting the settlement offers from the Archdiocese and the state, he had secured individual minimum settlement authority from each of his clients, along with their advance consent to proportionally divide any settlement offer that exceeded the total of their individual minimum settlement offers.

In response, the Bar contends that the accused violated RPC 1.7(a)(1) because the facts of this case represent what the Bar describes as a "limited pot" scenario. According to the Bar,

> "the 'limited pot' creates a zero sum situation in which every dollar received by one client is a dollar unavailable to the others—the very definition of a non-waivable conflict. A similar zero sum situation is created after a group of clients accepts a lump sum settlement. The group's shared lawyer cannot divide the proceeds because to each client he owes a duty—irreconcilable with his identical duty to his other clients—to advocate for the largest possible share of the proceeds."

With respect to the accused's argument that he obtained his clients' advance consent to proportionally divide any surplus settlement, the Bar contends that there is (1) no factual evidence in the record to support that claim, and (2) no legal authority for the proposition that a lawyer can secure an advance agreement from his clients allowing him to utilize a particular method for dividing settlement proceeds among them. To do so, the Bar maintains, is to actively represent one current client against another.

The accused's initial observation regarding the trial panel's failure to explain how the accused violated RPC 1.7(a)(1) is well taken; the trial panel opinion is, indeed, limited to a one-line legal conclusion that the accused violated that rule. Factual findings and legal analysis would have been very helpful to this court, and the trial panel's opinion does not meet the standard that we expect when an attorney's license to practice law is at stake. Nevertheless, as the accused recognizes, we are obligated to review the evidence in disciplinary decisions *de novo* in an effort to ascertain whether an alleged violation is supported by clear and convincing evidence. *In re Renshaw*, 353 Or 411, 417, 298 P3d 1216 (2013) (citing *In re Koch*, 345 Or 444, 447, 198 P3d 910 (2008)).

Turning to the merits of the trial panel's conclusion, we first observe that, when the accused began his representation of the *Sprauer* plaintiffs, he recognized that, although their interests did not presently conflict, they could conflict at some point in the future. He subsequently wrote letters to each of his clients outlining the advantages and disadvantages of joint representation, advised them to obtain independent legal advice, and obtained their consent to proceed with joint representation. As noted, the JRAs that the plaintiffs signed explained that the accused would endeavor to negotiate each client's claims individually and that he would have no role in any allocation decision.

When the accused began negotiations with the Archdiocese, he proceeded as agreed. The accused conferred with his clients individually and helped each decide on an acceptable individual settlement offer. As the Bar correctly recognizes, when the accused added those amounts together and offered to settle with the Archdiocese for the resulting total, the accused did not violate any rule of professional conduct. However, when the Archdiocese offered to settle for a figure that was nearly twice that total, a conflict arose. Each plaintiff had an interest in obtaining as great a portion of the surplus settlement as he could. Under those circumstances, the accused was ethically prohibited from deciding how to allocate the sum offered, and the accused does not contend otherwise.

What the accused does argue, however, is that, before the surplus settlement offer was received, each plaintiff

had agreed to divide any amount in excess of the total of the individual minimum settlement offers proportionately. Under that agreement, a plaintiff whose individual minimum settlement offer constituted, for example, 5 percent of the total of all of the plaintiffs' minimum settlement offers would receive 5 percent of any surplus settlement offer. There is nothing inherently wrong or unfair about such an agreement, but when multiple plaintiffs make *any* agreement to divide an offer that exceeds the total of their minimum offers, the plaintiffs have competing interests in that surplus. In agreeing to divide such a surplus lump-sum settlement offer in any way, a plaintiff necessarily must consider how to value his or her individual claim *vis-à-vis* the claims of the other plaintiffs. An individual plaintiff who is one of a number of jointly-represented plaintiffs rationally can decide without any knowledge or consideration of any other plaintiff's claim that his or her own claim is worth, for example, $15,000, and offer to settle for that sum. There is no upper limit on the amount that the plaintiff decides to offer and the offer is unaffected by offers that other plaintiffs might make. However, if an individual plaintiff instead agrees to accept a percentage of a defendant's lump-sum offer, the offer limits the amount available to the plaintiff and the plaintiff necessarily decides the value of his or her claim in comparison to the claims of others. Moreover, an individual plaintiff who agrees to settle for a percentage of a defendant's lump-sum offer determined by the relationship between the plaintiff's $15,000 minimum settlement offer and the total of all of the plaintiffs' minimum settlement offers, but who does not know that total, has no way to calculate the percentage that the individual plaintiff will receive.

In this case, we need not decide whether, with informed consent, the accused could have represented his clients in reaching an agreement to use that method to divide any Archdiocese offer in excess of $284,000. Although the accused testified that he obtained his clients' oral agreement to proceed according to that method,[3] there is no evidence that the accused obtained the plaintiffs' written

---

[3] The evidence that the plaintiffs orally agreed to divide any surplus offer proportionately is contested. In reaching our conclusion in this case, we assume, without deciding, that the accused's testimony is accurate.

informed consent as required by RPC 1.7(a)(1). There also is no evidence that the accused counseled his clients about the advantages and disadvantages of that method of allocation or advised them to seek independent legal advice before they agreed to proceed in that fashion.

An additional problem for the accused—and, in our view, an even more significant one—is evident in his division of the proceeds of the state settlement. Before negotiating the state settlement, the accused had informed his clients that, "[i]f all of you agreed to settle your cases on the same percentage basis as we did in the past, then I do not have a conflict." However, when the accused accepted the state's offer to settle the claims of all the *Sprauer* plaintiffs for a $1.05 million lump sum, he did not, in fact, distribute those funds on that basis. In his brief, the accused does not address that failure nor allude, as he did at the trial panel hearing, to possible "mathematical errors." From the letters that the accused sent to the Bar, it appears that the accused decided, after agreeing to settle with the state, which client should receive what portion of the state settlement. The accused's method of allocation may have been exceedingly fair, but each dollar that the accused allocated to one plaintiff was a dollar that he did not allocate to another—an allocation decision that, as he recognized in his JRAs, was one in which he was to have no role. The accused's decision to allocate the sum of $7,500 to New also was problematic for the same reason. The distribution to New may have been fair—perhaps more than fair, given New's criminal history and the accused's willingness to waive attorney fees and costs—but by allocating $7,500 to New, the accused deprived other client of those funds.

The fact that New and the other *Sprauer* plaintiffs agreed to accept the sums that they received in the two settlements is immaterial to whether the accused violated RPC 1.7(a)(1). There is clear and convincing evidence that the accused violated that rule.

## B.  *RPC 1.8(g)*

The accused also assigns error to the trial panel's conclusion that he violated RPC 1.8(g). That rule provides:

"A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregate agreement as to guilty or *nolo contendere* pleas, unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement."

Thus, if a settlement is an "aggregate settlement" under RPC 1.8(g), a lawyer may engage in such a settlement only if his clients give "informed consent, in writing." To do so, the lawyer must disclose "the existence and nature of all claims" and "the participation of each person in the settlement."

In this case, the accused does not argue that he obtained his clients' informed consent. Rather, he contends that he did not engage in an "aggregate settlement." The accused first notes that, as used in RPC 1.8(g), the term "aggregate settlement" has been, and remains, undefined by rule or this court's case law. Furthermore, the accused points out that two formal advisory opinions from the Bar have both categorized "aggregate settlements" as "all-or-nothing" settlements in which *all* claimants must accept a settlement offer for *any one* individual settlement to be effective. In this case, the accused contends, the Bar departed from that previous understanding to pursue a novel theory: *i.e.*, that under RPC 1.8(g), aggregate settlements can encompass multiple, simultaneously occurring settlements. The accused asserts that, as a result, the Bar seeks to impose liability for conduct neither defined nor proscribed by Oregon law at the time of the events at issue here, rendering RPC 1.8(g) void for vagueness under both the United States and Oregon Constitutions.

In response, the Bar argues that the term "aggregate settlement" connotes more than an all-or-nothing settlement; its ordinary meaning includes all settlements made on behalf of multiple clients when their claims are interdependent. In support of that proposition, the Bar cites several definitions of the terms "aggregate," or "aggregate

settlement," drawn from different sources,[4] including one now used by the American Law Institute (ALI). Under the ALI definition, aggregate settlements include both "lump sum" and "all-or-nothing" settlements because in both circumstances, the plaintiffs' claims are "interdependent." The ALI definition provides:

"Definition of a Non-Class Aggregate Settlement

"(a)   A non-class aggregate settlement is a settlement of the claims of two or more individual claimants in which the resolution of the claims is interdependent.

"(b)   The resolution of claims in a non-class aggregate settlement is interdependent if:

"(1)   the defendant's acceptance of the settlement is contingent upon the acceptance by a number or specified percentage of the claimants; or

"(2)   the value of each claim is not based solely on individual case-by-case facts and negotiations."

*Principles of the Law of Aggregate Litigation* § 3.16.

The ALI definition is particularly apt, the Bar continues, because it encompasses two broad bases of interdependency: collective conditionality, where a settlement is predicated on acceptance by all of the lawyer's clients (an "all-or-nothing" settlement), and collective allocation, where the value of a claim is not based solely on individual facts and negotiations (a "lump sum" settlement). The Bar maintains that a rule expressly covering both scenarios is important because both carry with them the potential to affect a lawyer's loyalty to individual clients (RPC 1.7), deference to client decisions concerning settlement (RPC 1.2), and the obligation to sufficiently apprise clients of facts that must be made clear before deciding whether to settle a matter (RPC 1.4).

The accused is correct that the ALI definition was not in place at the time of the settlement negotiations in this

---

[4] The Bar notes, for example, that *Black's Law Dictionary* defines "aggregate" as "formed by combining into a single whole or total." The Bar also sets out the following definition from *ABA Formal Ethics Opinion* No. 06-438 (2006): a settlement is aggregate when (1) the claims or defenses of multiple clients represented by the same attorney are (2) resolved together under a single proposal.

case and that this court has yet to construe the term "aggregate settlement" as it is used in RPC 1.8(g). However, we agree with the Bar that RPC 1.8(g) is intended to address conflicts of interest that may arise when an attorney conducts settlement negotiations on behalf of multiple clients. As the creator of the Model Rules from which Oregon's Rules of Professional Conduct are derived, the American Bar Association (ABA) has explained that the aggregate settlement rule is designed to protect clients whose claims or defenses are jointly negotiated and resolved through by agreement. Specifically, the ABA writes that the rule

> "deters lawyers from favoring one client over another in settlement negotiations by requiring that lawyers reveal to all clients information relevant to the proposed settlement. That information empowers each client to withhold consent and thus prevent the lawyer from subordinating the interests of the client to those of another client or to those of the lawyer."

*ABA Formal Op* 06-438, 2 (2006).

The ALI definition of an "aggregate settlement" succinctly sets out the circumstances in which a lawyer's multiple clients may have conflicting interests when they engage in joint settlement negotiations. Under the ALI definition, a lawyer does not make an "aggregate settlement" if the lawyer consults with each client individually, obtains minimum settlement authority from each, and then makes a settlement offer that represents the total of the individual minimum settlement offers. In that circumstance, each client has individually valued his or her own claim before settlement is reached. However, when the value of one client's claim depends on the value of other clients' claims, the interests of the clients conflict, and the settlement that a lawyer reaches constitutes an "aggregate settlement." The ALI definition reflects the underlying rationale of both RPC 1.8(g) and RPC 1.7, and we therefore adopt it in construing the term "aggregate settlement" as that term is used in RPC 1.8(g).

In adopting that definition, we reject the accused's arguments that we are bound by the Bar's advisory opinions defining "aggregate settlements" as "all-or-nothing"

agreements or, alternatively, that RCP 1.8(g) is void for vagueness. First, our case law makes clear that, with regard to advice from the Bar that leads a lawyer to engage in a particular set of actions, that advice does not estop the Bar from subsequently bringing disciplinary charges if warranted by the resulting conduct. *In re Brandt/Griffin*, 331 Or 113, 132, 10 P3d 906 (2000). Neither can such advice be invoked as a defense to the charged violations. *In re Ainsworth*, 289 Or 479, 490, 614 P2d 1127 (1980). Consequently, any past advice or opinion proffered by the Bar in an effort to clarify what constitutes an "aggregate settlement" does not shield the accused from the allegations that he violated RPC 1.8(g) in this case.

Second, with regard to the accused's void-for-vagueness arguments, we adhere to this court's observation that constitutional void-for-vagueness challenges are generally inapplicable in the context of a disciplinary matter. *See In re Rook*, 276 Or 695,705, 556 P2d 1351 (1976) (observing that technicalities of criminal law not necessarily relevant in disciplinary matters and rejecting argument that rule at issue was void for vagueness); *see also In re Carini*, 354 Or 47, 54 n 5, 308 P3d 197 (2013) (declining accused's request to overrule *Rook* and rejecting argument that rule at issue was void for vagueness). In this case, we conclude, as we did in *Rook*, that the standards of professional conduct in RPC 1.8(g) are sufficiently definite for the purpose of a disciplinary proceeding.[5]

Having concluded that RPC 1.8(g) applies to all multiple client settlements that meet the ALI definition of "aggregate settlement," we hold that, in this case, both the Archdiocese and state settlements fall within that definition. When the accused offered to settle with the Archdiocese, he was not engaged in an aggregate settlement. At that time, the value of each plaintiff's claim was based solely on each individual plaintiff's evaluation of the facts in his own case. The value of the plaintiffs' individual claims, when totalled, equaled the lump sum that they sought. However, when the

---

[5] We also note that, when the accused himself used the term "aggregate settlement" in his JRAs, he understood that he could have "no role whatsoever" in a decision about how a "single lump sum fund" was to be allocated between clients.

Archdiocese and later, the state, made lump-sum settlement offers to the *Sprauer* plaintiffs, their lump-sum offers exceeded the plaintiffs' total individual minimum settlement offers. At that point, the total value of each plaintiff's claim was greater than each plaintiff had determined it to be when viewing it in isolation. In the Archdiocese settlement, the value of each plaintiff's claim was determined by using a formula that calculated the value of each plaintiff's claim in comparison to the value of other plaintiffs' claims. In the state settlement, the accused did not follow that formula; he used a method of his own design to determine the value of each client's claim.

The accused concedes that he did not obtain his clients' informed consent, in writing, to the formula or method that he used to divide the defendants' lump-sum settlement offers. We therefore conclude that the accused violated RPC 1.8(g).

## C. *RPC 1.4(b) and RPC 8.4(a)(3)*

In his third and fourth assignments of error, the accused assigns error to the trial panel's conclusions that he violated RPC 1.4(b) and RPC 8.4(a)(3). RPC 1.4(b) provides:

> "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

RPC 8.4(a)(3) provides:

> "It is professional misconduct for a lawyer to:
>
> "* * * * *
>
> "engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]"

Again, the trial panel decision does not explain the basis for its conclusion that the accused violated those provisions. In its brief to this court, the Bar focuses on the letter that the accused sent to New stating, "I was able to settle your case for the $7,500 you requested." According to the Bar,

> "[t]hat statement was affirmatively false and false by omission. The Accused did not settle *New's* case for an

*individual sum* of *$7,500*. He had very recently settled the cases of all the clients for the *lump sum* of *$600,000,* and planned to divide it among the clients and give New the smallest share. By telling New that his case had settled for $7,500, the Accused knowingly stated a falsehood and omitted material facts. Had New realized that his settlement was part of a much larger whole, he might well have refused it or at least asked the Accused to explain how the apportionment was decided."

(Emphases in original; citation omitted.) The Bar also asserts that the accused violated RPC 1.4(b) by depriving New of information that he needed in order to make an informed decision regarding his role *vis-á-vis*: (1) the accused's continued representation of the *Sprauer* plaintiffs as a whole, and (2) their respective participation in the Archdiocese and state settlements.

We already have concluded that, to comply with RPC 1.7(a)(1) and RPC 1.8(g), the accused was required to apprise all of the *Sprauer* plaintiffs—including New—of the information that they needed to determine how defendants' settlement offers would be allocated between them. The accused's failure to provide the information necessary to satisfy those rules also means that he failed to explain matters to the extent necessary for informed decision-making under RPC 1.4(b). Consequently, we conclude that the accused violated RPC 1.4(b) with respect to New, and turn to RPC 8.4(a)(3).

RPC 8.4(a)(3) prohibits an attorney from making misrepresentations to a party that are knowing, false, and material. *See In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001) (so stating from former version of RPC 8.4(a)(3), DR 1-102(A)(3)). Such misrepresentations can be made affirmatively or by omission. *In re Hostetter*, 348 Or 574, 594-95, 238 P3d 13 (2010). When considering whether a lawyer's conduct amounts to dishonesty, fraud, deceit, or misrepresentation for disciplinary purposes, we restrict our examination of that question to the theories presented by the Bar in support of its allegations. *See In re Carpenter*, 337 Or 226, 233, 95 P3d 203 (2004) (so stating under former version of RPC 8.4(a)(3), DR 1-102(A)(3)). Here, the Bar's theory is that the accused

misrepresented affirmatively or by omission the particulars of the Archdiocese's settlement in his letter informing New of that settlement. Thus, to establish a violation of RPC 8.4(a)(3) in this case, the Bar must prove by clear and convincing evidence that (1) the accused's statement to New regarding his settlement with the Archdiocese was affirmatively false or false by omission, (2) the accused knew it to be false, and (3) the statement was material—that is, it "would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or at 53; *see also In re Huffman*, 331 Or 209, 218, 13 P3d 994 (2000) ("material facts" are those that, had they "been known by the court or other decision-maker, would or could have influenced the decision-making process significantly" (quoting *In re Gustafson*, 327 Or 636, 648-49, 968 P2d 367 (1998))).

We conclude that the Bar failed to meet its burden to prove those elements. Although the Bar argues that, if New had known that other plaintiffs had negotiated for a proportional share of the any settlement amount, he may have sought a similar benefit, the record is to the contrary. New agreed to accept the sum of $7,500 when the Archdiocese initially offered it, and persisted in his efforts to obtain that sum. The letter on which the Bar relies was written *after* settlement negotiations were concluded and it correctly states that the accused had settled New's case for the sum that New had requested. Although the accused should have disclosed more information about the terms of the aggregate settlement to New and would have better represented New had he done so, we conclude that the Bar did not prove that the accused made false or material statements to New or that he violated RPC 8.4(a)(3).

D. *Causes of action that the trial panel failed to address*

As noted, the trial panel's opinion in this case addressed only the first three causes of complaint alleged by the Bar. The Bar now urges this court, on *de novo* review, to examine and rule on the allegations set out in its fourth and fifth causes of complaint. First, the Bar argues that, under *In re Koch*, 345 Or 444, 198 P3d 910 (2008), a trial panel's failure to make the necessary findings in a disciplinary matter does not preclude this court from making

such findings on *de novo* review. The Bar then notes that BR 10.5(c) expressly allows the respondent in a Bar disciplinary matter to address issues on appeal not raised by the appellant. That rule provides, in part:

> "Answering briefs are not limited to issues addressed in petitions or opening briefs, and may urge the adoption, modification or rejection in whole or in part of any decision of the trial panel."

We agree that BR 10.5 allows the Bar unusually broad latitude. That is particularly true in situations where, as here, the Bar is the respondent on appeal and not an appellant or cross-appellant. The question before us, however, is not whether the Bar can make such arguments—it can—but whether, on this particular record, we should rule on them in light of *Koch.*

In *Koch*, the court was confronted with a unique set of circumstances. Because the accused in that case had failed to answer the Bar's complaint, the Bar had entered a default order against her pursuant to BR 5.8(a).[6] 345 Or at 446. In the wake of that default, BR 5.8(a) required subsequent trial panels to view the allegations in the complaint against the accused as true. After the default order was entered, a trial panel was appointed and proceeded to impose sanctions without first determining that the accused had, in fact, committed the ethical violations in question. *Id.* The trial panel appeared to assume—because of the previous default—that the alleged violations had automatically been established by clear and convincing evidence. On appeal, however, this court made clear that disciplinary sanctions could be determined only upon a finding that an ethical violation had occurred. *Id.* at 447. We nevertheless concluded that remand to the trial panel was unnecessary. Citing our authority to conduct *de novo* review in disciplinary matters,

---

[6] BR 5.8(a) provides, in part:

"If an accused lawyer fails to resign or file an answer to a formal complaint within the time allowed by these rules, or if an accused lawyer fails to appear at a hearing set pursuant to BR 2.4(h), the trial panel chairperson, or the regional chairperson if a trial panel has not been appointed, may file with the Disciplinary Board Clerk an order finding the accused in default under this rule. Copies of the order shall be served on the parties. The trial panel shall thereafter deem the allegations in the formal complaint to be true."

*see In re Fitzhenry*, 343 Or 86, 88, 162 P3d 260 (2007) ("We review a decision of the trial panel *de novo.*"), we proceeded to fill the analytical gap left in the trial panel's decision, concluding that the accused had, indeed, committed multiple violations of the Rules of Professional Conduct and imposing a 120-day suspension as a sanction.

However, this case is substantively different from *Koch*. Because there has been no default on the part of the accused, we cannot deem the allegations set out in the Bar's fourth and fifth causes of complaint to be true under BR 5.8(a). In addition, there are no trial panel findings concerning the factual underpinnings of those allegations, no findings related to the accused's culpability in that regard, and no sanction-related analysis. Indeed, the trial panel has failed to provide this court with *anything* addressing the fourth and fifth causes of complaint against the accused, and certainly nothing that resembles a decision on the merits of the allegations set forth therein.

In disciplinary matters, Oregon law expressly authorizes parties to seek review of trial panel "decisions." *See* ORS 9.536(1) ("The Oregon State Bar or the accused may seek review *of the decision* by the Supreme Court." (Emphasis added.)). In this case, because the trial panel failed to provide any semblance of a decision regarding the two omitted causes of complaint, we decline to consider them on review.

## SANCTION

We turn, finally, to the appropriate sanction. We begin by applying the analytical framework set out in the American Bar Association's *Standards for Imposing Lawyer Sanctions* (ABA Standards). *In re Obert*, 352 Or 231, 258, 282 P3d 825 (2012). In accordance with the ABA Standards, we first consider the duty violated, the accused's state of mind, and the actual or potential injury caused by the accused's conduct. *In re Kluge*, 332 Or 251, 259, 27 P3d 102 (2001); ABA Standard 3.0. We next determine the existence of any aggravating or mitigating circumstances. *Kluge*, 332 Or at 259. Finally, we consider the appropriate sanction in light of this court's case law. *Id*. In fashioning an appropriate sanction, our purpose is to protect the public and the

administration of justice from lawyers who have not properly discharged their duties to clients, the public, the legal system, or the profession.

Here, the accused violated RPC 1.7(a)(1), RPC 1.8(g), and RPC 1.4(b) and, in doing so, breached his duty to avoid conflicts of interests with his clients, ABA Standards 4.3, and his duty to be candid with them, ABA Standards 4.6. In failing to obtain his clients' informed consent to the method of allocation that he used in the Archdiocese settlement and in failing to adhere to that method of allocation in the state settlment, the accused acted intentionally. *See* ABA Standards at 7 ("intent" defined as "the conscious objective or purpose to accomplish a particular result"). In doing so, the accused created at least the potential for injury to each client. Some clients obtained a greater portion of the surplus settlement offers than did others, and none of the clients had the information that the rules contemplate when they accepted the distribution that they received. Under ABA Standards 4.32(b), suspension generally is appropriate when a lawyer knows of a conflict of interest, does not disclose its possible effects, and causes injury or potential injury to the client in the process.

We next consider whether mitigating or aggravating factors might affect that determination. We find several aggravating factors at play here. First, the accused has a prior disciplinary history, having been admonished in 1989 for making misrepresentations to clients in order to increase his fee, and publicly reprimanded in 2000 for misrepresenting his identity in the course of gathering information for his clients. Second, the accused has substantial experience in the practice of law. As mitigating factors, we consider the accused's cooperation with Bar's investigation and the fact that there is no evidence that any of the plaintiffs suffered actual injury. None of the *Sprauer* plaintiffs objected to the settlement distributions at the time that they received them, and only New objected thereafter. That mitigating factor is tempered, however, by the fact that the accused did not distribute the state settlement to the plaintiffs according to the formula that he had told them he would use—a formula that he must, at some point, have believed to be a fair one.

Having made a preliminary determination that a suspension of some term is appropriate here, we turn to this court's case law to help determine the duration of that suspension. As we have noted in the past, case-matching in the context of disciplinary proceedings "is an inexact science." *In re Stauffer*, 327 Or 44, 70, 956 P2d 967 (1998). Still, this court's past cases provide some guidance in fashioning an appropriate sanction here and demonstrate the propriety of a suspension in this particular matter.

As we have explained, a finding that a lawyer has engaged in a conflict of interest, without more, typically justifies a 30-day suspension. *In re Campbell*, 345 Or 670, 689, 202 P3d 871 (2009). Similarly, a finding that a lawyer has failed to adequately explain a legal matter to a client under RPC 1.4(b), without more, also justifies a 30-day suspension. *In re Snyder*, 348 Or 307, 323-24, 232 P3d 952 (2010). What is less clear, however, is the sanction that should be imposed for the accused's violation of RPC 1.8(g).

That is so because this court has yet to consider what constitutes an appropriate sanction for lawyers who overstep the ethical boundaries that delineate the aggregate settlement rule. Other jurisdictions have arrived at a variety of sanctions ranging from one year of conditional supervision to disbarment, depending on the facts of each case. *See, e.g., Kentucky Bar Association v. Mills*, 318 SW3d 89 (Ky 2010) (disbarment appropriate when multiple violations—including fraudulent settlement method and misrepresentation to court—also accompanied by violation of aggregate settlement rule); *In re McNeely*, 313 Wis 2d 283, 752 NW2d 857 (2008) (60-day suspension appropriate when multiple violations—including misconduct involving misrepresentation and making false statement to tribunal—also accompanied by violation of aggregate settlement rule); *In re Berlin*, 306 Wis 2d 288, 743 NW2d 683 (WI 2008) (six-month suspension appropriate when multiple violations—including failure to act with reasonable diligence and conduct involving dishonesty—also accompanied by violation of aggregate settlement rule); *In re Hoffman*, 883 So 2d 425 (La 2004) (three-month conditionally deferred suspension appropriate when failure to obtain informed consent for joint representation of three siblings in will contest also accompanied

by violation of aggregate settlement rule); *In re Faucheux*, 818 So 2d 734 (La 2002) (one year of supervised probation appropriate when multiple violations—including failure to communicate with client, engaging in current client conflict of interest, and conduct prejudicial to the administration of justice—also accompanied by violation of aggregate settlement rule).

Here, the Bar seeks a six-month suspension predicated largely on the notion that the accused's actions in this matter (1) contained a strong element of self-interest and (2) involved a misrepresentation that reflected poorly on the legal profession. This court has imposed substantial sanctions when a conflict of interest is accompanied by a dishonest act reflecting poorly on a lawyer's fitness to practice law. *See, e.g.*, *In re Morris*, 326 Or 493, 953 P2d 387 (1998) (120-day suspension for attorney who (1) knowingly altered and filed a document previously signed and notarized by client and (2) represented multiple current clients when such representation was likely to result in a conflict). However, because the Bar did not prove that the accused engaged in such misrepresentations, that combination is not present here.

What we do find is that the accused's substantial experience in the law had made him aware of the ethical problems that could arise if he were to participate in the allocation of a lump-sum settlement offer; yet—particularly with respect to the state settlement—that is exactly what the accused did. In addition, the accused did not obtain the informed consent required by the rules of professional conduct at issue here, and, as a result, he exposed his clients to a risk of injury. Those are significant violations that, in light of the accused's disciplinary history, warrant more than a 30-day suspension. We conclude that a 90-day suspension is appropriate.

The accused is suspended from the practice of law for 90 days, commencing 60 days from the date of the filing of this decision.