Argued and submitted March 16; respondent is disbarred, effective 60 days from the date of this decision July 29, 2021

In re Complaint as to the Conduct of

ANDREW LONG
OSB No. 033808,
*Respondent.*

(OSB 1779, 1786, 1787, 1788, 1809, 1831, 1832, 1833,
1864, 1875, 1876, 1877, 1886, 1887, 1888, 18129, 18170)
(SC S067095)

491 P3d 783

A trial panel of the Disciplinary Board found that the respondent had committed numerous violations of the Rules of Professional Conduct and concluded that he should be disbarred. Respondent sought *de novo* review. *Held*: (1) There was clear and convincing evidence that the respondent committed violations by, among other things, intentionally converting client funds, failing to refund unearned fees, collecting illegal fees, failing to communicate with clients, neglecting matters, and failing to cooperate with the Oregon State Bar's investigations; and (2) disbarment is the appropriate sanction.

Respondent is disbarred, effective 60 days from the date of this decision.

En Banc

On review of the decision of a trial panel of the Disciplinary Board.

Andrew Long, Portland, argued the cause and filed the briefs on behalf of himself.

Susan R. Cournoyer, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief on behalf of the Oregon State Bar.

PER CURIAM

Respondent is disbarred, effective 60 days from the date of this decision.

## PER CURIAM

In this lawyer discipline case, a trial panel of the Disciplinary Board found, by clear and convincing evidence, that respondent had committed 50 violations of the Rules of Professional Conduct (RPC) by, among other things, intentionally converting client funds, failing to communicate with clients, neglecting matters, failing to refund unearned fees, and failing to cooperate with the Oregon State Bar's investigations. The trial panel concluded that respondent should be disbarred. On review in this court, respondent challenges the trial panel's conclusions and contends that disbarment is not appropriate. We agree with the findings and conclusions of the trial panel, subject to exceptions noted below, and order that respondent is disbarred from the practice of law.

## I.   BACKGROUND

Respondent graduated from law school and became a member of the Oregon State Bar in 2003. He worked for a small law firm in Roseburg until leaving Oregon in 2004 to begin graduate legal studies. After completing his graduate degree and clerking, respondent worked as a law professor specializing in environmental law. In 2015, respondent moved back to Oregon to begin practicing law. He started at a small firm in November 2015 and then opened a solo practice in January 2016. At around the same time, respondent was going through a difficult divorce and custody dispute with his wife, who resided in Florida with their children.

The Bar has brought two disciplinary proceedings against respondent. The Bar initiated the first disciplinary proceeding in November 2017. As part of that proceeding, the Bar sought respondent's immediate temporary suspension, which this court granted in December 2017 after reviewing the filings submitted by the Bar and respondent. A special master then held an evidentiary hearing in February 2018 and drafted a report, which concluded that respondent's continued practice of law represented a threat to the public and recommended that this court continue respondent's suspension during the pendency of that disciplinary proceeding. The court agreed with that recommendation and, in May 2018, ordered respondent's continuing

suspension. That first disciplinary proceeding has not yet been resolved.[1]

The matter now before this court is a review of the trial panel opinion in the second disciplinary proceeding brought by the Bar. The Bar filed its initial complaint in that proceeding in March 2018 and amended the complaint twice. In the final amended complaint, the Bar alleged that respondent had committed 64 violations of the Rules of Professional Conduct related to his representation of numerous clients. Following an evidentiary hearing and arguments from the Bar and respondent, the trial panel issued a written opinion concluding that the Bar had established, by clear and convincing evidence, that respondent had committed 50 of the charged violations. Based on those violations, the trial panel concluded that respondent should be disbarred.

## II. ANALYSIS

Respondent seeks review of the trial panel opinion. *See* ORS 9.536(1) ("The Oregon State Bar or the accused may seek review of the [trial panel] decision by the Supreme Court."). He contends that he committed no rule violations and that disbarment is not warranted. The Bar does not seek review of the charged violations that the trial panel found unproven. As a result, we limit our review to the 50 violations found by the trial panel in its written opinion and determining an appropriate sanction. We review the trial panel's findings *de novo*, ORS 9.536(2); Bar Rule of Procedure (BR) 10.6, to assess whether the Bar has proved the violations by clear and convincing evidence, BR 5.2.

### A. *Additional Background and Preliminary Arguments*

Because many separate matters are at issue, it is helpful to discuss some of the common themes that run through

---

[1] At the trial panel hearing in the first disciplinary proceeding, the Disciplinary Board's adjudicator concluded that respondent had defaulted after failing to appear. The trial panel denied respondent's motion to set aside the default. As a result, the trial panel assumed all the allegations in the complaint as true and ordered respondent's disbarment. This court held that the trial panel had erred in denying respondent's motion for relief from default, vacated the trial panel opinion without reaching the merits, and remanded to the trial panel for retrial. *In re Long*, 366 Or 194, 458 P3d 688 (2020).

them and, to the extent possible, resolve arguments relevant to multiple matters.

Respondent operated as a solo practitioner from January 2016 until his suspension in December 2017. Respondent admits that he lacked well-developed practice management skills. He attributes that deficiency to his inexperience, his Attention Deficient and Hyperactivity Disorder, and his limited financial resources, which necessitated hiring assistants with little experience working within a legal practice.

Respondent's limited financial resources also led to his extensive use of fee agreements that allowed him to access advance fees before completing the promised services. Generally, in the absence of appropriate written designation and disclosure, advance fees paid to a lawyer remain client property that must be kept in a lawyer trust account, separate from the lawyer's own property. RPC 1.15-1(a). In those instances, the advance fees may be removed from the lawyer trust account and become the lawyer's property only after the lawyer has performed the promised services.

The Rules of Professional Conduct allow for alternative fee agreements, under which advance fees become the lawyer's property at the time the fees are received—that is, before the lawyer has performed the promised services. RPC 1.5(c)(3). In those instances, the advance fees are not placed in the lawyer's trust account and are sometimes referred to as "earned on receipt." Fees may be "earned on receipt" only pursuant to a written fee agreement disclosing that "the funds will not be deposited into the lawyer trust account" and that "the client may discharge the lawyer at any time and in that event may be entitled to a refund of all or part of the fee if the services for which the fee was paid are not completed." *Id*.

According to respondent, because he frequently had pressing personal and business costs, he would not have been able to operate his legal practice if he could access a client's fees only after he completed the promised services. Respondent testified that, as a result of his financial circumstances, he used "earned on receipt" agreements in all of his matters, except the few matters that he took on a

contingent fee basis. Although evidence in the record indicates that respondent did not always enter into "earned on receipt" agreements, it is true that, in many of the matters at issue in this proceeding, respondent entered into a written fee agreement properly designating advance fees as "earned on receipt" and then billed the client against those advance fees at an hourly rate. Respondent therefore was able to make immediate use of the funds subject to those agreements, which he used to pay rent, staff, and other personal and business expenses.

Although respondent's handling of those advance fees did not itself violate a Rule of Professional Conduct, it nevertheless left respondent's clients vulnerable. "Earned on receipt" fee agreements shift the risk of loss to the client. If the client relationship ends before the lawyer has performed the services needed to keep the advance fees, then the lawyer is required to return the fees for the uncompleted work. If the lawyer has already spent the advance fees and has no other financial resources upon which to draw, then the lawyer may be unable to provide the client with the required refund.

That is what happened to many of respondent's clients. The client provided respondent with advance fees that were designated as "earned on receipt." The client then terminated respondent's service before respondent performed the services needed to permit him to retain the advance fees. And respondent failed to provide the required refund of the advance fees that respondent had not, in fact, earned by performing legal services. For that conduct, the Bar alleged that respondent repeatedly violated RPC 1.5(a) (charging excessive fee) and RPC 1.16(d) (failing to return unearned fee).

Respondent presents various arguments in response to those allegations. In some cases, respondent disputes how much money was received in advance. In others, he contends that he did, in fact, perform the promised services. Those are fact issues that we address below. When those arguments are unavailable, respondent argues that, but for this court's December 2017 suspension order, he would have either completed the promised services or been able

to earn additional income from other matters that he could have used to refund the clients. That argument is not a defense to the alleged violations. The charged violations are established by facts demonstrating that respondent failed to return unearned fees.[2] Although the reasons for a lawyer's failure to return unearned fees may be relevant to assessing an appropriate sanction, those reasons are not relevant to assessing whether a violation has occurred in the first place.[3]

The record in this case reveals that respondent had disputes with clients about returning unearned fees beginning in October 2016. Those disputes increased in the months leading up to his suspension in December 2017, as respondent allowed problems in his personal life to affect his ability to provide his clients with promised services. In September 2017, respondent's roommate alleged that he had struck her. That allegation led respondent's landlord to initiate eviction proceedings. In October 2017, respondent's former assistant, who was acquainted with his roommate and a witness in the eviction proceedings, obtained a stalking protective order against respondent. The Bar sought respondent's immediate suspension in November 2017. And respondent was arrested for violating the stalking protective order in December 2017, before this court ordered respondent's suspension later that month. Those events provide context for respondent's evident financial desperation at that time, leading to the trial panel's most serious finding: that

---

[2] Respondent presents no legal argument attempting to distinguish the appropriate grounds on which the Bar may separately establish violations of the rule prohibiting excessive fees, RPC 1.5(a), and the rule requiring the refund of unearned fees, RPC 1.16(d). We therefore do not consider the scope of those provisions, which would not, in any event, affect the outcome or the sanction in this case.

[3] That conclusion is consistent with this court's decision in *In re Bertoni*, 363 Or 614, 426 P3d 64 (2018). In that case, the respondent was hired on hourly fee agreements to defend a client in a civil matter and to file a petition for post-conviction relief for the same client. As part of those fee agreements, he received advance-fee retainers. As he provided the client with services, he charged against the retainers using his hourly rate. He was suspended by this court and then terminated by his client before he could complete each matter. But the Bar failed to prove that he had performed insufficient work on each matter before his suspension and termination to earn each of the advance-fee retainers. As a result, the court concluded that the Bar had failed to establish that fees were excessive. *Id.* at 634-35.

respondent intentionally converted funds belonging to his client, Williams. That matter is addressed further below.

Finally, as part of its investigation into respondent's alleged misconduct, the Bar sent respondent multiple letters seeking his response to the allegations. Those letters frequently demanded respondent's version of the events in question, an accounting of any funds that respondent received in the matter, and copies of billing records. The trial panel concluded that respondent failed to respond to those letters in 11 different matters.

Under RPC 8.1(a)(2), "[a] lawyer *** in connection with a disciplinary matter[] shall not *** knowingly fail to respond to a lawful demand for information from a[] *** disciplinary authority ***." Respondent acknowledges that he failed to respond to the Bar's demands for information. He maintains, however, that his failure did not violate RPC 8.1(a)(2) because he believed that the Bar's inquiries were not a "lawful demand for information." According to respondent, he believed in good faith that the Bar's inquiries "exceeded the Bar's authority and/or [were] being used to advance illegal and unethical conduct."

There is no merit to respondent's defense. A Bar inquiry is lawful if it is based on "an arguable complaint of misconduct, one that the Bar [has] legal authority to investigate." *In re Paulson*, 346 Or 676, 689, 216 P3d 859 (2009), *adh'd to as modified on recons*, 347 Or 529, 225 P3d 41 (2010); *see also* ORS 9.542(1) (authorizing rules governing "the investigation of the conduct of attorneys"); BR 2.2(b)(1) (describing Disciplinary Counsel's authority to investigate allegations or instances of alleged misconduct); BR 2.5(b)(2) (describing process for Client Assistance Office to refer complaints to Disciplinary Counsel). We find no support in the record for respondent's contention that the Bar was investigating alleged rule violations, most of which stemmed from complaints by clients or third parties, for reasons other than the Bar's legitimate regulatory purpose.[4] We therefore

_____

[4] Respondent claims that misconduct by the Bar's Disciplinary Counsel's Office establishes equal protection and due process violations. We find no evidentiary support for those claims. We similarly find no evidentiary support for respondent's claim that the adjudicator was biased against him. As a result, we reject those claims.

conclude that respondent's failures to respond to the Bar's requests for information establish violations of RPC 8.1(a)(2), as noted in each matter below.

Because respondent failed to respond to those investigatory demands, the record is incomplete as to several of the matters discussed below relating to whether respondent performed sufficient services to earn the advance fees that he kept. In some instances discussed below, the lack of a complete record meant that the Bar was unable to carry its burden to prove, by clear and convincing evidence, that respondent failed to earn the advance fees that he kept. *See* BR 5.2 ("The Bar has the burden of establishing misconduct by clear and convincing evidence."). Nevertheless, failing to cooperate with the Bar's investigation is not a viable strategy for avoiding sanction. Not only is failing to cooperate its own violation of the Rules of Professional Conduct, RPC 8.1(a)(2), but, in appropriate cases, such conduct may establish an aggravating circumstance justifying an upward departure from a presumptive sanction, *see* American Bar Association, *Standards for Imposing Lawyer Sanctions* 9.22(e) (1991) (amended in 1992) (identifying "bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency" as an aggravating circumstance).

B.   *Matters and Violations*

We review the matters in largely chronological order.

1.   *Richman matter*

The Richmans hired respondent in August 2016 to work on three matters: an insurance claim and two juvenile court matters. The Richmans provided respondent with advance fees and costs. Respondent did no work on two of the matters, and he made two court appearances on one of the juvenile court matters. Work on that juvenile court matter was billed at an hourly rate. At the second appearance, in October 2016, the trial judge said that respondent appeared intoxicated and reset the matter. Although respondent denied being intoxicated, the Richmans fired respondent the next day. They asked for an accounting of the work that

he had performed and a return of any unearned advance fees and costs.

Respondent never performed an accounting. Instead, he told the Richmans that he wanted to avoid the accounting by refunding them the entire amount that they had paid him in advance fees and costs. Mrs. Richman told respondent that they had paid him $2,000 in advance fees and $500 in advance costs. Respondent replied that his records showed that the Richmans had paid him only $1,000 in advance fees and $500 in advance costs. Respondent then decided not to provide a full refund, claiming that he had earned $500, which he would keep. He therefore sent the Richmans a check for $1,000 without an accounting demonstrating the grounds for the money that he kept.

Mrs. Richman emailed documents to respondent purporting to show the additional $1,000 in advance payments. Although those documents are not in the record, she testified to the additional payments under oath at respondent's suspension hearing in February 2018. And that testimony is in accord with the record of the parties' documented communications. After receiving the emailed documents, respondent admitted that his previous assistant had made numerous recordkeeping mistakes that needed correcting. He said that he would review the matter and get back to them "presumably with more money." Respondent never did get back to them and ignored Mrs. Richman's later emails inquiring about the additional payments. We therefore conclude that respondent failed to refund the Richmans $1,000 in unearned fees.

We agree with the trial panel's conclusion that respondent violated RPC 1.5(a) (charging excessive fee), RPC 1.15-1(d) (failing to provide an accounting), and RPC 1.16(d) (failing to return unearned fee).

2.  *Charpentier matter*

Charpentier hired respondent in early November 2016 on an hourly rate agreement to remedy the unlawful sale of her deceased mother's home. She paid respondent $600 in advance fees. Respondent did not place the funds into his lawyer trust account. Although respondent

claims that the $600 was paid pursuant to a written fee agreement designating the money as earned on receipt, that agreement does not appear in the record. Respondent first told Bar investigators that he had sent Charpentier a fee agreement, which she had failed to return. He later told the trial panel that Charpentier had signed and returned the fee agreement but blamed his former assistant for misplacing it. Charpentier, who lives in Washington and never met respondent in person, testified that she neither received nor signed a written fee agreement from respondent. According to Charpentier, if she had received and signed the fee agreement, she would have retained a copy of it and would have documented that fact in the notebook that she used to contemporaneously record her interactions with respondent.

Charpentier additionally testified that respondent had failed to respond to numerous phone messages, even though she expected the work to be done promptly. Charpentier fired respondent in late November or early December after learning that the house had been sold again. At the time of his termination, respondent had billed 2.1 hours to the matter, most of which was for time spent on telephone calls with Charpentier. Respondent disputed Charpentier's version of events. He maintained that he had reviewed her file and determined that her case had no merit, and that she had become upset when he told her that.

The trial panel found Charpentier's testimony to be more credible and concluded that respondent had violated RPC 1.15-1(a) (failing to hold client property in trust account), RPC 1.15-1(c) (failing to keep unearned fees in trust account), and RPC 1.3 (neglecting client matter).[5] We agree with that conclusion.

3. *Mitchell matter*

The Mitchells hired respondent in April 2016 to pursue a claim against Mr. Mitchell's former employer and, in early 2017, hired respondent to pursue an appeal from a decision of the Workers' Compensation Board. Respondent

_____

[5] Neglect may be found from a failure to act during a short period of time if the matter is urgent. *See In re Meyer (II)*, 328 Or 220, 224-25, 970 P2d 647 (1999) (finding neglect where respondent failed to act over a two-month period).

collected at least $18,500, based on hourly rate agreements, from the Mitchells over the course of the two matters.

In the action against Mr. Mitchell's former employer, respondent filed a complaint in August 2016 and then failed to follow up with opposing counsel, who was interested in settling. After no settlement was reached by January 2017, opposing counsel moved to dismiss the complaint or to make the complaint more definite and certain, raising numerous defects in the complaint. The trial court granted the motion in part and allowed for an amended complaint, which respondent drafted and filed. Ultimately, the opposing party offered another settlement, but the Mitchells maintain that respondent did not fully explain the terms of the settlement. The Mitchells fired respondent in August 2017, and hired a new attorney, Hennagin, who testified that respondent's work was so deficient that he had to start over and file a new complaint. After respondent was discharged by the Mitchells, they agreed to a settlement with Mr. Mitchell's former employer. Respondent had collected about $9,200 in fees related to that action.

The trial panel determined that the services respondent provided to the Mitchells in that case were not worth the $9,200 that he had collected and concluded, as a result, that respondent had violated RPC 1.5(a) (charging excessive fee). We do not agree that clear and convincing evidence in the record supports that conclusion. There is no allegation that respondent did not work the hours needed to justify $9,200 at a reasonable hourly rate. Respondent's work set up the case for settlement, even though respondent failed to follow through on the settlement offers proposed by the opposing party. Respondent's failings, if any, appear related to his failure to effectively communicate with the Mitchells, and the Bar alleged no violations related to that conduct.

In the workers' compensation matter, respondent filed a brief in the Court of Appeals. That work was done in the spring of 2017. The Court of Appeals affirmed without opinion. Respondent collected $9,300 in that matter. Hennagin, whom the trial panel found credible, testified that those fees were charged and collected without the approval of the Workers' Compensation Board or the court, as required by

ORS 656.388(1). *See, e.g.*, *Shearer's Foods v. Hoffnagle*, 363 Or 147, 149, 420 P3d 625 (2018) ("Attorneys representing workers' compensation claimants may not recover a fee for legal services performed on appeal unless the court approves the fee[.]"). In his briefing before this court, respondent does not assert that he received approval.

Based on those facts, the trial panel concluded that respondent again had violated RPC 1.5(a) (charging illegal fee). We agree with the trial panel's conclusion. Collecting legal fees in violation of ORS 656.388(1) constitutes collecting illegal fees under RPC 1.5(a). *See In re Knappenberger*, 344 Or 559, 564, 186 P3d 272 (2008) (concluding that lawyer charged an "illegal fee" under DR 2-106(A), the predecessor to RPC 1.5(a), by charging fees in connection with a client's Social Security disability claim without prior approval of the Social Security Administration, as required under federal law). Finally, respondent failed to respond to the Bar's investigative inquiries, in violation of RPC 8.1(a)(2).

4. *Avila-Chulim/Greene matter*

Avila-Chulim and his girlfriend Greene contacted respondent through the Bar's Modest Means Program, which is intended to help low- and moderate-income clients find affordable legal services. On May 26, 2017, Avila-Chulim and Greene hired respondent to pursue a modification of Avila-Chulim's parenting plan—a matter that they considered urgent. In fact, Greene testified that they could have filled out the necessary forms themselves, but they wanted to hire a lawyer to complete the proceeding more quickly. They paid respondent $2,000 in advance fees through an hourly rate agreement designating the money as earned on receipt.[6] On June 8, 2017, after not hearing anything further from respondent and learning that respondent had not promptly obtained the court documents necessary to begin Avila-Chulim's petition, Avila-Chulim and Greene terminated respondent and demanded an accounting and a refund.

---

[6] The hourly rate that respondent charged under that agreement appears to violate the terms of the Modest Means Program. The Bar did not charge that conduct as a separate violation.

Greene estimated that she contacted respondent 15 to 20 times over the months that followed seeking the accounting and refund. Respondent ultimately sent Avila-Chulim and Green an invoice in September 2017, showing $360 worth of work, but he did not refund the $1,640 in unearned fees that he had collected. Greene followed up in October, November, and December 2017. Each time she was told that the refund check would be sent shortly. But respondent never refunded the $1,640 in unearned fees that he had collected, and he failed to cooperate with the Bar's investigation into the matter. At the trial panel hearing, Long did not deny that he owed a refund to Avila-Chulim and Greene but stated that he did not have sufficient funds to pay it.

We agree with the trial panel's conclusion that respondent violated RPC 1.5(a) (charging excessive fee); RPC 1.16(d) (failing to return unearned fee); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation). And, based on respondent's conduct following his termination in June 2017, we agree with the trial panel's conclusion that respondent violated RPC 1.4(a) (failing to keep client informed) and RPC 1.4(b) (failing to explain matters so client can make informed decision).

5.  *Butler matter*

Butler hired respondent on June 30, 2017, to research a family trust issue and provided respondent with $2,500 in advance fees on an hourly rate agreement designating the money as earned on receipt. About a week later, Butler terminated respondent after concluding that respondent's experience was not sufficiently related to the issue in dispute. Butler asked respondent to return any unearned fees promptly. Respondent did not dispute that he owed Butler a refund but did not return the unearned fees. Butler filed a small claims action against respondent on August 4. On September 26, 2017, during a mediation in that action, respondent agreed to provide Butler with a full refund, which respondent paid at a later date to Butler's apparent satisfaction.

We agree with the trial panel's conclusion that, by refusing to pay an undisputed refund until sued by his

client, respondent violated RPC 1.16(d) (failing to refund unearned fee).

6. *Grotz matter*

Grotz hired respondent in December 2016 on an hourly rate agreement to work on a dispute that Grotz had with his neighbor. Respondent filed a complaint in that matter in February 2017. Although it is unclear what other work respondent did on the matter after filing the complaint, the record establishes that, by June 2017, Grotz had become frustrated that respondent was not being more proactive in his case and that respondent was not responding to Grotz's emails seeking updates. That frustration continued through November 2017. At one point, toward the end of November, respondent informed Grotz that a previously scheduled hearing was coming up in his case. Grotz was upset that respondent had not told him about the hearing sooner and that respondent did not otherwise explain to him the purpose of the hearing.

Grotz received an invoice from respondent in November 2017 showing that he owed respondent almost $1,000 for services that respondent had performed. Shortly thereafter, Grotz paid respondent $2,500. Some of that money constituted advance fees. Grotz then fired respondent in December 2017, after reading about respondent's legal troubles in the newspaper. At that time, Grotz asked for a refund of any unearned fees. Respondent never provided a refund and did not cooperate with the Bar's investigation into the matter.

Grotz did not testify at the trial panel hearing. Respondent and Glick, who worked as respondent's assistant in December 2017, testified that Grotz had reversed his final $2,500 payment through his credit card company. Communications between Grotz and the Bar suggest that Grotz might have disputed the $2,500 payment through his credit card company. Without Grotz's testimony or additional financial documents, the record fails to establish how that dispute was resolved.

Based largely on respondent's acceptance of the $2,500 shortly before his termination and his failure to

return any unearned portion of that money, the trial panel concluded that respondent violated RPC 1.5(a) (charging excessive fee) and RPC 1.16(d) (failing to return unearned fee). We do not agree with those conclusions. The Bar did not establish, by clear and convincing evidence, that respondent had retained the $2,500 payment and therefore did not establish that respondent had collected money from Grotz for more than the value of the services that he provided. We agree, however, with the trial panel's remaining conclusions that respondent violated RPC 1.4(a) (failing to keep client informed); RPC 1.4(b) (failing to explain matters so client can make informed decision); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

7. *Agero matter*

Agero, who lives in Spain, hired respondent in December 2016 on an hourly rate agreement to pursue a claim against a septic tank inspection company. Respondent filed and served a complaint against the inspection company in July 2017. Respondent was never very responsive to Agero's emails. He became even less responsive beginning in October 2017. At that time, the trial court hearing Agero's matter sent respondent a notice of intent to dismiss for want of prosecution. Respondent did not respond to that notice. The trial court then dismissed the case in November 2017. Respondent did not tell Agero about the dismissal. In December 2017, when he was suspended from continuing her representation, respondent failed to tell Agero of his suspension. Later that month, because respondent had not been responding to Agero's communications, Agero checked the internet and found out about respondent's suspension. Respondent did not respond to the Bar's attempt to investigate that matter.

We agree with the trial panel's conclusion that respondent violated RPC 1.3 (neglecting client matter) and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

8. *Beutler matter*

Beutler hired respondent in July 2017 on an hourly rate agreement to handle a property dispute and provided

respondent with $1,200 in advance fees designated as earned on receipt. Beutler called respondent throughout August 2017 but was unable to reach him. He spoke with respondent's assistant several times in October, but never spoke with respondent. By December 2017, when respondent was suspended, Beutler had no information about any work that respondent had performed on his matter. Respondent did not tell Beutler that he was suspended. Beutler later learned about the suspension from the Bar. Respondent did not refund any of the $1,200 that Beutler had paid him. Respondent also did not cooperate with the Bar's effort to investigate the matter.

Respondent maintains that he earned the $1,200 because, according to respondent, at the time of his suspension, he had completed the research necessary to advise Beutler even though he had not yet memorialized that advice in written work product. Respondent provided no evidence of that research. Without such evidence, and given respondent's documented history of ignoring Beutler's matter, respondent's testimony is not credible.

We therefore agree with the trial panel's conclusion that respondent violated RPC 1.4(a) (failing to keep client informed); RPC 1.4(b) (failing to explain matters so client can make informed decision); RPC 1.5(a) (charging excessive fee); RPC 1.16(d) (failing to return unearned fee); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

9. *Gehrke-Harris matter*

On November 9, 2017, Gehrke-Harris hired respondent on an hourly rate agreement to seek a visitation order so that her husband could see his son. She provided respondent with $400 in advance fees that were designated as earned upon receipt. Five days later, she asked respondent for an update. Respondent said he was not feeling well. Gehrke-Harris terminated respondent on November 27, after learning about respondent's legal troubles in the newspaper. She asked respondent for a refund at that time. Respondent said that he would provide her with a refund as soon as possible, but he failed to provide her with the refund. He also failed to cooperate with the Bar's effort to investigate the matter.

We agree with the trial panel's conclusion that respondent violated RPC 1.5(a) (charging excessive fee); RPC 1.16(d) (failing to return unearned fee); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

10.   *Stone matter*

In September 2017, Stone hired respondent on an hourly rate agreement to represent him in a custody modification proceeding. From September to November 2017, Stone paid respondent $1,500 in advance fees designated as earned on receipt. Respondent never filed the petition. According to respondent, he started the petition but "did not get very far." Respondent does not maintain that he performed $1,500 worth of services to Stone before his December 2017 suspension. Respondent did not notify respondent that he was suspended and did not cooperate in the Bar's investigation into the matter.

We agree with the trial panel's conclusion that respondent violated RPC 1.4(a) (failing to keep client informed); RPC 1.4(b) (failing to explain matters so client can make informed decision); RPC 1.5(a) (charging excessive fee); RPC 1.16(d) (failing to return unearned fee); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

11.   *Taffese matter*

Taffese hired respondent in June 2017 on an hourly rate agreement to pursue claims against a home repair contractor. Taffese provided respondent with $5,000 in advance fees designated as earned on receipt. After respondent filed a complaint, the defendant filed a motion to dismiss in October 2017, which remained unresolved at the time of respondent's suspension in December 2017. Respondent did not tell Taffese about the motion to dismiss or his suspension and did not provide a refund. Respondent also failed to cooperate with the Bar's efforts to investigate the matter.

The trial panel concluded that respondent had violated RPC 1.5(a) (charging excessive fee) and RPC 1.16(d) (failing to return unearned fee). We do not agree with those conclusions. Respondent provided legal services to Taffese. The record does not contain evidence of the extent or value

of those legal services. Thus, the Bar has failed to establish, by clear and convincing evidence, that respondent charged an excessive fee or retained unearned fees. Nevertheless, we agree with the trial panel's remaining conclusions that respondent violated RPC 1.4(a) (failing to keep client informed); RPC 1.4(b) (failing to explain matters so client can make informed decision); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

12.  *Frackowiak matter*

Frackowiak hired respondent in July 2017 on an hourly rate agreement to represent him in several different matters. At least one matter related to a commercial lease dispute. Frackowiak provided respondent with $1,200 in advance fees that were designated as earned on receipt. Respondent performed research and sent two letters advancing Frackowiak's interests with regard to the commercial lease dispute. In December 2017, not long before his suspension, respondent appeared at Frackowiak's home one evening and asked for $2,500, which Frackowiak gave him. Frackowiak, who is currently incarcerated for theft and securities fraud, testified at the trial panel hearing that he believed that the $2,500 constituted additional advance fees. Respondent testified that he had already performed substantially more work than was covered by the original $1,200 in advance fees and the $2,500 was for work that he had already performed. Respondent never sent Frackowiak an invoice, and his billing records are not part of the record in this proceeding. Frackowiak learned of respondent's suspension from the media coverage. Respondent failed to cooperate with the Bar's efforts to investigate this matter.

The trial panel concluded that respondent had violated RPC 1.5(a) (charging excessive fee) and RPC 1.16(d) (failing to return unearned fee). We do not agree with those conclusions. As with some of the other clients whose representation is at issue here, respondent provided Frackowiak with legal services. The record does not contain evidence of the extent or value of those legal services. Thus, the Bar has failed to establish, by clear and convincing evidence, that respondent charged excessive fees or retained unearned fees. We agree with the trial panel's remaining

conclusions that respondent violated RPC 1.4(a) (failing to keep client informed); RPC 1.4(b) (failing to explain matters so client can make informed decision); and RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

13. *Williams matter*

The most serious single set of allegations against respondent relates to his representation of Williams and his handling of her money. Williams was referred to respondent by a former client, Wilson. Williams hired respondent in April 2017 on an hourly rate agreement to resolve a dispute with a homeowners' association (HOA). Respondent started work in July 2017 and had some communications with the HOA's lawyer. The HOA's lawyer sent respondent a check for $31,689.29, made payable to Williams, to resolve one component of the dispute. Respondent received that check on or around August 22, 2017.

Respondent promptly texted Williams to tell her that he had her money and asked how he should convey the money to her. She did not immediately respond to that text or his follow-up texts. On August 25, he deposited the check into his lawyer trust account. On August 26, respondent sent Williams an email saying that he was going to deduct $640 from the total, representing the outstanding balance that she owed him for his work on the matter to date.

Williams eventually responded in early September, stating that she had just obtained a new phone and had only received his last text message indicating that respondent had over $30,000 waiting for her but needed direction on how to distribute the funds. Williams replied but did not provide that direction. Instead, Williams and respondent discussed whether to proceed with additional claims against the HOA.

In October, respondent began making withdrawals from his lawyer trust account, frequently transferring money to his personal account. At that time, nearly all the money in the trust account belonged to Williams. By the end of October, respondent had withdrawn more than half of Williams's money. One of the withdrawals that respondent made was in the amount of $4,000. Respondent gave that money to Wilson to bail someone else out of jail, someone

known to Williams. Respondent released the funds to Wilson without authorization from Williams.

In November, respondent drafted a letter to the HOA regarding additional claims that Williams might pursue. Williams provided input on that letter, although it is unclear whether respondent ever sent the letter to the HOA.

On December 1, Williams texted respondent, asking how she could get her money because she wanted to buy a house. She received no response from respondent, who had been continuing to make withdrawals from his trust account. Then on December 4, she texted again, asking what was going on. Respondent said that he had technological problems but would follow up on December 5. When respondent did not follow up by December 6, Williams texted, "I need to pick up my money!!!!!!!" Respondent did not respond. So, on December 11, Williams texted, "I want my money." Respondent replied that he was having difficulty texting so he wanted to meet in person. On December 13, Williams told Wilson that she wanted to pick up her papers and money from respondent and get a new lawyer. A few days later, respondent told Williams that he had spoken with her acquaintance, Wilson, and could have his assistant bring Williams $1,000. Williams told respondent that she needed "the entire amount" and asked when she could stop by to pick it up. Williams also texted Wilson to say that it was "weird" that respondent was offering her $1,000 of her money. The two then discussed having Wilson pick up Williams's papers and money from respondent.

By December 20, 2017, the day that this court issued its order immediately suspending respondent, respondent had transferred all of Williams's money out of his lawyer trust account. That same day, Wilson went to respondent's office to pick up Williams's case file and money. Respondent gave Wilson Williams's papers and $200 cash for Williams. After leaving respondent's office, Wilson met with Williams. Williams testified that, at that meeting, Wilson had told her that respondent had admitted to spending all of her money but that respondent could pay her back if she did not talk to the Bar and if he won a case he was working on. Two days later, respondent texted Williams, "I talked to [Wilson].

Thank you for understanding." He also asked her to confirm whether she wanted the Bar to take over her file. Williams did not respond.

Two months later, in February 2018, Williams texted respondent, "im getting concerned about my money u spent probably cause haven't gotten any type confirmation from u telling me what ur plan is …. can u do that??" Respondent replied that they should meet in person.

At the trial panel hearing, Williams testified that she never received any of the money that the HOA had sent to respondent and that she did not authorize respondent to transfer the money to anyone else, including to himself. Respondent disputed that testimony and presented an entirely different version of events. Although respondent admits that he gave Wilson $4,000 of the trust money without Williams's authorization, he denies misappropriating the remainder of the money. He maintains that he transferred about $12,000 to himself as payment for legal services, although the only work that he did for Williams after receiving the funds was drafting a short demand letter to the HOA. Respondent further testified that he had given Williams the remaining money, about $15,000, in small cash payments over time. According to respondent, Williams would repeatedly stop by his office unannounced and ask for some of her money in cash, which respondent provided to her from his personal funds. Respondent testified that, following those visits, he would transfer Williams's money from his lawyer trust account into his personal account to make up for the money that he had provided to Williams.

The trial panel did not find respondent's testimony credible, and neither do we. Unlike respondent's version of the events, Williams's version of the events is in accord with the record documenting the communications between respondent and Williams. Respondent repeatedly attempted to avoid Williams's inquiries about her money. When he did respond, his responses were not consistent with someone who had already satisfied his financial obligations to Williams. Instead, he studiously avoided comment on the money and instead suggested that they meet in person.

Based on those facts, we agree with the trial panel's conclusion that respondent violated RPC 8.4(a)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness to practice law); RPC 8.4(a)(2) (committing a crime—first-degree theft under ORS 164.055—that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer);[7] RPC 1.15-1(a) (failing to hold client property in trust account); and RPC 1.15-1(d) (failing to deliver funds or surrender property).

### 14.  *Heubner and Leatham matters*

The trial panel found that respondent had failed to cooperate with the Bar's investigation into two additional matters, involving separate complaints made by Heubner and Leatham. We agree that the Bar proved those allegations by clear and convincing evidence and that, as to each matter, respondent violated RPC 8.1(a)(2) (failing to cooperate with Bar disciplinary investigation).

### C.  *Sanction*

We proceed to consider the appropriate sanction for respondent's misconduct. In so doing, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* to determine a preliminary sanction by considering the ethical duties violated, respondent's mental state at the time of the misconduct, and the potential or actual injury caused by respondent's misconduct. We also consider any aggravating or mitigating circumstances that may justify either an increase or a decrease in the presumptive sanction. Finally, we consider the appropriate sanction in light of this court's case law. *In re Graeff*, 368 Or 18, 27, 485 P3d 258 (2021).

We need not engage in an extended analysis to conclude that the presumptive sanction is disbarment. "[T]his court often has stated that even a single act of

---

[7] Respondent has not been prosecuted for theft in a criminal proceeding. But the lack of an underlying criminal prosecution is "not dispositive" of claims under RPC 8.4(a)(2). *In re Walton*, 352 Or 548, 554, 287 P3d 1098 (2012); *see also In re Kimmell*, 332 Or 480, 485, 31 P3d 414 (2001) ("[T]his court has held that proof that an accused lawyer was convicted for such an act is not required to find a violation of [the predecessor to RPC 8.4(a)(2)].").

intentional conversion of client funds presumptively warrants disbarment." *In re Webb*, 363 Or 42, 53, 418 P3d 2 (2018); *see also* ABA Standards 4.11 ("Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client."). In this case, respondent intentionally converted Williams's funds, causing her financial injury. Therefore, the presumptive sanction is disbarment.

And, beyond the four violations related to his intentional conversion of Williams's funds, we have determined that respondent committed 40 other violations related to 14 other matters that involved failing to refund unearned fees, collecting illegal fees, failing to communicate with clients, neglecting client matters, and failing to cooperate with the Bar's investigations into that conduct. In doing so, he violated duties owed to his clients (ABA Standards 4.0), duties owed to the public (ABA Standards 5.0), and other duties as a professional (ABA Standards 7.0). Those violations are a variety of intentional, knowing, and negligent conduct.

Respondent's misconduct caused extensive injuries, which were not merely financial. Many of respondent's clients had limited financial means and needed their advance fees returned before they could afford to hire new attorneys. When respondent failed to return those advance fees, some clients simply went without legal representation. Stone, for example, is a painting subcontractor who saved up money during his busy season of the year to hire a lawyer so that he could see his son again. At that time, his son was about to start high school. When respondent took Stone's money without providing him any legal services, Stone's effort to see his son was set back another year.

Other clients reported emotional distress from respondent's neglect and failure to keep them informed. Charpentier testified that, between not hearing back from respondent during the engagement and then having to repeatedly follow up with respondent to get her money back, "[i]t was two months of just pure hell." Grotz, who for months tried unsuccessfully to get substantive responses from respondent on the status of his case, reported health

problems as the result of anxiety from not knowing whether his legal interests were being protected.

Having determined that the presumptive sanction is disbarment, we consider whether the balance of aggravating and mitigating circumstances justifies a departure from that presumptive sanction. We find the following aggravating circumstances: dishonest or selfish motive; pattern of misconduct; multiple offenses; bad faith obstruction of the disciplinary proceeding; refusal to acknowledge the wrongful nature of his conduct; vulnerability of victims; indifference to making restitution; and illegal conduct. ABA Standard 9.22(b), (c), (d), (e), (g), (h), (j), (k). And we find the following mitigating circumstances: absence of a prior disciplinary record and personal or emotional problems. ABA Standard 9.32(a), (c).

We conclude that the aggravating circumstances substantially outweigh the mitigating circumstances. Respondent repeatedly put his own interests ahead of his clients, to their financial and emotional detriment. And his failure to accept responsibility for any of his conduct is, to put it bluntly, incredible, particularly because, as to some matters, he concedes the facts establishing the violations. He nevertheless persists in deflecting responsibility by arguing that his actions were the product of circumstances created by his ex-wife, his administrative assistants, his clients, and the Bar attorneys investigating the complaints. Respondent sees himself as the victim and fails to fully acknowledge the harm that he has caused to his clients and the profession. That perspective, apparent in one representation after another, demonstrates respondent's unfitness to represent future clients. We therefore conclude, after considering the aggravating and mitigating factors set out above, that the sanction of disbarment is appropriate.

That conclusion is supported by our case law. The most relevant case to respondent's conversion misconduct is *In re Phinney*, 354 Or 329, 311 P3d 517 (2013), which resulted in disbarment. In that case, the respondent served as the treasurer of an alumni association, a position that was unrelated to his legal practice. Over the course of about two and one-half years, he withdrew $32,600 from the association's

bank accounts without authorization and deposited that money into his personal account to pay expenses for himself and his family. The respondent maintained that he withdrew the money because he had experienced serious personal financial difficulties and always intended to pay back the association. In fact, by the time that the theft was discovered, the respondent had already deposited $18,070 back into the association's account. *Id.* at 330-31.

This court concluded that the respondent's conduct constituted theft by appropriation under ORS 164.015(1), establishing a violation of RPC 8.4(a)(2) (committing crime that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer). *Id.* at 333-34. The court also concluded that the respondent's conduct violated RPC 8.4(a)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness to practice law). *Id.* at 334-35.

Based on those violations, the court determined that the presumptive sanction was disbarment. *Id.* at 337. The court then concluded that the balance of the aggravating and mitigating circumstances did not justify a departure from that presumptive sanction. The court reached that conclusion even though, like respondent in this case, the respondent in *Phinney* had no prior disciplinary record and had experienced personal and emotional problems, and, unlike respondent in this case, the respondent had fully cooperated with the Bar's investigative process and had repaid a substantial amount of the money that he improperly took. *Id.* at 337-38. The respondent in *Phinney* further did not have the litany of additional offenses and victims that respondent has in this case. As a result, we conclude that our case law supports the sanction of disbarment.

Respondent is disbarred, effective 60 days from the date of this decision.