No. 26    July 25, 2024    589

IN THE SUPREME COURT OF THE
STATE OF OREGON

In re: Complaint as to the Conduct of

JASON P. MUNN
OSB No. 061674
*Respondent.*

(OSB 2139, 2168, 2238) (SC S070455)

En Banc

On review of the decision of a trial panel of the Disciplinary Board.

Argued and submitted May 9, 2024.

Jason P. Munn, Redmond, argued the cause and filed the brief for respondent *pro se.*

Susan R. Cournoyer, Assistant Disciplinary Counsel, Oregon State Bar, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

Respondent is suspended from the practice of law for a period of 24 months, effective 60 days from the filing of this decision.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar alleged that respondent engaged in misconduct amounting to four violations of Rule of Professional Conduct (RPC) 1.1 (failure to provide competent representation); two violations of RPC 1.3 (neglect of a legal matter); three violations of RPC 1.4(b) (failure to explain matter to the extent reasonably necessary to permit client to make an informed decision); and one violation of RPC 8.1(a)(2) (knowing failure to respond to lawful demand for information from disciplinary authority). A majority of the trial panel concluded that respondent had committed those 10 violations and imposed a 24-month suspension; a dissenting panel member disagreed with one aspect of the majority's analysis under the rules and would have imposed a 12-month suspension. Respondent seeks review as to both the violations and the sanction.

The Bar brought this case based on allegations that respondent, a criminal defense lawyer, had not been reviewing discovery before resolving his client's cases. Relying on *In re Bettis*, 342 Or 232, 240, 149 P3d 1194 (2006), the Bar contends that a criminal defense lawyer's failure to review available discovery before resolving a case is a categorical violation of RPC 1.1's duty of competence. As we will explain, we decline to take a categorical approach to what constitutes a violation of RPC 1.1's duty of competence; that is a fact-specific inquiry that depends on the circumstances. However, reviewing this matter *de novo*,[1] we conclude that respondent violated all four rules, resulting in 10 violations, as alleged, and we suspend him from the practice of law for 24 months.

## I. BACKGROUND

On review in this court, respondent contends that the Bar failed to prove the alleged violations by clear and convincing evidence for two reasons. First, he contends

---

[1] We review lawyer disciplinary matters *de novo*. Bar Rule of Procedure (BR) 10.6 (stating that the court "shall consider each matter de novo upon the record and may adopt, modify or reject the decision of the trial panel in whole or in part and thereupon enter an appropriate order.") On *de novo* review, this court sits as factfinder based on the record developed by the trial panel; that record must demonstrate that the Bar has proved each violation by clear and convincing evidence. BR 5.2. That means that the truth of the asserted facts must be "highly probable." *In re Claussen*, 331 Or 252, 260, 14 P3d 586 (2000).

that the Bar's case rests entirely on a Bar grievance filed by a deputy district attorney, with no evidence presented from his former clients. Second, he claims that records, purporting to show that he had not reviewed discovery in many cases, were introduced with "no proper foundation." At oral argument in this court, respondent also explained that he often resolved cases quickly based on his client's instructions, and he contended that doing so did not violate the Rules of Professional Conduct, even if he did so without reviewing all the discovery materials. Respondent argues, for example, that if a client wanted to accept an early plea offer that would result in probation and release from custody, carrying out those instructions was appropriate even if respondent had not reviewed the available discovery. As to the sanction, respondent maintains that the trial panel erred in failing to consider certain mitigating factors.

As we will explain, we reject respondent's contentions and agree that a 24-month suspension is appropriate in this case. We begin with the facts established in the record.

A.  *Respondent's Representation of Indigent Criminal Defendants*

Respondent has been a member of the Bar since 2006. Between 2006 and 2017, he worked at the Malheur County District Attorney's Office, where he was eventually promoted to chief deputy district attorney. He then left that office to work as a public defender under contract with a consortium, the 22nd Circuit Defenders ("the consortium"). The consortium contracted with Oregon Public Defense Services (OPDS)[2] to represent indigent clients in criminal and juvenile matters in Jefferson and Crook counties. Respondent worked with the consortium from 2017 until approximately June 2020.

B.  *Grievances Filed with the Bar and Other Purported Misconduct*

In June 2020, while respondent was under contract with the consortium, the Chief Deputy District Attorney for Jefferson County, Foster, filed a grievance with the Bar, claiming that respondent had not accessed discovery in 96

_____

[2] OPDS now is known as the Oregon Public Defense Commission.

cases in which his clients had accepted plea offers. Some of those plea agreements resulted in significant prison sentences. Foster's grievance was based on information that she had retrieved from her office's electronic case management system, called "Prosecutor by Karpel" (Karpel). Although Foster had identified 96 potentially problematic cases, her grievance focused on 37 specific cases in which she asserted that respondent had either never requested discovery, had not accessed any discovery, or had accessed only very limited discovery.

Foster's grievance indicated that, in separate cases involving three of respondent's clients—Provencher, Williams (two cases), and Rivers—respondent either did not review discovery at all or did not review material parts of the available discovery before those clients accepted plea offers resulting in lengthy prison sentences.[3] In addition, Foster's grievance explained that respondent had delayed more than three weeks before filing what he had been told would be an unopposed motion to determine whether one client (Sorensen) was mentally fit to proceed, leaving her in jail without treatment; he also had failed to take any action to arrange for housing or mental health treatment needed to facilitate release and resolution of the case. Foster later submitted additional corroborating information to the Bar, which included screenshots from Karpel showing that, in certain cases, discovery had been sent by the prosecutor's office, but respondent had accessed it only in part or not at all.

Foster also told an administrator of the consortium, Kimble, that it appeared that respondent had not been reviewing discovery. Kimble terminated respondent from the defense consortium and notified OPDS. OPDS, in turn, suspended respondent from handling public defense cases, and its General Counsel, Deitrick, filed his own Bar grievance regarding respondent's conduct.

In addition to the grievances filed by Foster and Deitrick, two of respondent's former clients filed grievances with the Bar. One former client, Arthur, alleged that

_____

[3] We set out some additional detail respecting the individual client matters later in this opinion.

respondent had not adequately represented him in connection with a no-contest plea. The Bar's investigation determined that respondent had not reviewed any discovery—which had included Arthur's lengthy criminal record—before Arthur accepted the no-contest plea, which included a contingent six-year prison sentence if probation were revoked.

Another former client, Hooper, reported to the Bar that respondent had mishandled an evidentiary hearing. In Hooper's matter, during a three-month period after remand from the Court of Appeals, respondent had not prepared or acquainted himself with the evidentiary issue on remand, had not obtained or reviewed the evidence at issue, and had not obtained a supplemental transcript prepared by appellate counsel. Additionally, Hooper's appellate counsel, Montague, had expressed concerns to respondent before the evidentiary hearing that respondent was not communicating with Hooper, and, during the hearing, Hooper repeatedly tried to raise concerns about the transcript that the participants were using. The trial court ultimately concluded that the challenged evidence had been properly received, reinstated Hooper's convictions, and sentenced him to 90 months in prison. Montague later complained to Deitrick at OPDS regarding respondent's handling of the case.

C.   *The Bar's Investigation and Requests for Information*

In early November 2020, the Bar began investigating Foster's grievance.

As part of that investigation, the Bar's Disciplinary Counsel's Office (DCO) sent respondent a letter seeking information regarding his representation of two clients—Sorensen and one other client—and asked him to "respond to the allegation that you did not review all of the discovery available" in each of the 37 cases identified in Foster's grievance. DCO granted respondent two extensions of time and sent a second request in late December.

Respondent provided a partial response at the end of December 2020, stating that "[d]iscovery materials were reviewed," but he did not respond to DCO's inquiries about specific cases. In January 2021, DCO sent another inquiry, again asking respondent if he had reviewed discovery

materials in each of the 37 specific cases identified by Foster. Shortly thereafter, respondent provided a similar general response. In that response, respondent no longer claimed that "[d]iscovery materials were reviewed." Instead, he stated that "I always felt, in each case, I had sufficient knowledge of the facts to properly advise and counsel all former clients in the pursuit of their goals." In March, the Bar sent respondent another information request, this time asking respondent to explain how he had obtained discovery in the 37 specified cases. Respondent did not respond to that request.

Due to respondent's incomplete responses, DCO filed a petition for administrative suspension under Bar Rule of Procedure (BR) 7.1. Respondent did not respond to that petition, and the Bar's Adjudicator suspended him in April 2021. The Bar later filed its formal complaint (discussed below) in September 2021. In December 2021, respondent finally provided specific responses to DCO's questions about whether he had reviewed discovery materials in the 37 cases. As to most of those cases, respondent stated that he had reviewed the affidavit of probable cause because client "wished to enter a plea." Those affidavits were available in the trial court's electronic file; reviewing them did not require an attorney to access discovery through the Karpel system.

D.  *The Bar's Complaint*

In September 2021, the Bar filed its formal complaint,[4] which set out five "Causes of Complaint" that alleged multiple violations of four separate rules relating to respondent's representation of six named clients—Arthur, Hooper, Sorensen, Provencher, Williams, and Rivers. The complaint further described respondent's failure to review available discovery as to "numerous" unnamed other clients whom respondent represented in criminal cases and alleged that respondent had knowingly failed to respond to DCO's requests for information.

More specifically, the complaint alleged four violations of RPC 1.1 (failure to provide competent representation)

---

[4] The Bar later filed an amended complaint; all references hereafter to the Bar's complaint are to its amended complaint.

in connection with all six of the named clients, specifically focusing on the failure to review discovery, with additional, related allegations as to Hooper (failure to adequately prepare for the evidentiary hearing on remand) and Sorensen (failure to take actions to facilitate pretrial release and resolution). The complaint further alleged that respondent had violated RPC 1.3 (neglect of a legal matter) in connection with Hooper and Sorensen. And the complaint alleged three violations of RPC 1.4(b) (failing to adequately explain matters to the extent reasonably necessary to permit client to make an informed decision) in connection with five of the six named clients (all except Hooper), contending that respondent had violated that rule when he advised the clients regarding plea agreements without having reviewed significant available discovery. Finally, the complaint alleged that respondent had violated RPC 8.1(a)(2) when he knowingly failed to respond to the Bar's request for information in connection with the Bar's investigation.

In respondent's answer to the complaint, he stated that he had "felt at the time" that he had sufficient knowledge of the facts of each case in which he represented an indigent client. He indicated that "many times" he was able to review discovery materials without downloading them, and that he was provided with probable cause affidavits "which often mirrored police reports." He further stated that he "spent time" with the clients that he represented and "answered any and all questions" that they had.

Respondent admitted, however, that he "could have been more diligent" in requesting and documenting discovery materials, and he indicated that he was experiencing "many personal and family hardships" as well as "professional hardships" at the time. He indicated that he was "severely unsatisfied" with his role with the consortium, though he was "not attempting to deny responsibility or shift blame." He further indicated that he "accept[ed] responsibility for any mistakes and errors" that he had made while practicing law in Jefferson County. Finally, he apologized for his "delayed response" to the Bar's inquiry and complaint, stating that it was not his "intent to be uncooperative" but

that he was "still under a lot of stress" and needed time to address his physical and mental health during that time.

E.   *Trial Panel Proceedings*

At the trial panel hearing, the Bar presented testimony from Foster (from the District Attorney's Office) and Deitrick (from OPDS), both of whom had filed grievances with the Bar; Kimble (from the consortium); and Montague (the appellate attorney for Hooper). The Bar did not, however, present testimony from the two former clients who had filed grievances (Hooper and Arthur) or from any of the other former clients named in its complaint. Respondent testified on his own behalf.

Foster testified that she had become concerned about respondent's failure to access discovery made available to criminal defense lawyers through Karpel. She explained that, when a defense lawyer requests discovery, the DA's office sends them an email with a link that allows the lawyer to access and download discovery through Karpel, which records the date and time of access when the lawyer clicks the link. After reviewing the Karpel access records, Foster ultimately determined that respondent had not accessed all the available discovery in the 96 cases listed in her grievance. Respondent did not object during the trial panel proceedings to Foster's testimony regarding either Karpel generally or what Foster had learned by accessing it.

Kimble testified that, upon learning from Foster about respondent's failure to review discovery, she confronted respondent, who responded that he "goes off of what his clients tell him" and that he only looked at discovery if he was going to trial. Kimble testified that she then terminated respondent from the consortium and reported the issue to OPDS. Kimble further testified that reviewing only the probable cause affidavit is not sufficient, because it typically will not contain any witness contact information, criminal history, or mitigating information, and thus cannot be used to inform plea negotiations. Kimble also confirmed Foster's testimony that the Karpel system shows whether and when a defense lawyer accesses discovery materials even if the lawyer reviews them online without downloading them.

Deitrick testified that, after learning about Foster's assessment based on Karpel records, OPDS suspended respondent's authority to handle public defense cases, and it hired the Oregon Justice Resource Center and the Oregon Innocence Project to review criminal cases that had been assigned to respondent to determine whether any of his former clients had been harmed.

The Bar presented testimony from two lawyers who worked for the Oregon Innocence Project's Wrongful Conviction Review Program (WCRP)—Wax (the WCRP Legal Director) and Powers. Both testified that, as part of the WCRP audit, they asked respondent for permission to access his files for the affected clients so that they could review them but did not receive a response for many months. After Powers drove out to meet respondent in person, respondent finally provided her with both his electronic and paper records. The paper records were in two plastic bins, a trash bag, and a loose-leaf stack. Staff at WCRP, thereafter, spent weeks organizing those papers. Wax testified that the "overwhelming majority" of respondent's client files contained no discovery.

Wax had previously worked as a New York state public defender and as a federal public defender in Oregon during his career. The Bar asked Wax about the ABA *Criminal Justice Standards - Defense Function*, 4-4.1 (4th ed 2017), which describes the duty of defense counsel to investigate and provides:

"(a)   Defense counsel has a duty to investigate in all cases, and to determine whether there is a sufficient factual basis for criminal charges.

"(b)   The duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt, the client's expressed desire to plead guilty or that there should be no investigation, or statements to defense counsel supporting guilt."

Wax explained that, in his opinion, these standards generally required defense counsel to "test the case" presented by the prosecutor. That duty has two components: understanding the information that the state has against

the client, and conducting a sufficient independent investigation into the facts to determine whether the state's information is accurate. Wax explained that the second component includes discussing the case with the client, interviewing witnesses, and exploring mitigating information. Mitigating information, Wax explained, is any evidence that might lead the prosecutor to make a better plea offer, including errors in the probable cause affidavit or the availability of a motion to suppress evidence.

Wax further testified that, in his opinion, a defense lawyer's duty to "test the case" is not overcome by a client's desire to plead guilty. He explained that clients rarely understand the difference between "moral guilt" and "legal guilt," and that feeling guilty is not the same as having committed the charged offense. Thus, clients must rely on defense counsel to explain the law applicable to their situation. Additionally, defense attorneys are obligated to pursue any mitigating information that could result in a better plea offer. When asked whether it would be sufficient to review only the probable cause affidavit from law enforcement, Wax replied "No, absolutely not."

Respondent testified that he had sometimes reviewed discovery online without downloading the materials and suggested that Karpel documented only when discovery materials were downloaded. He further testified that he thought that reviewing the probable cause affidavit was usually sufficient to advise his clients. During closing, he added that he was being "sarcastic" when he told Kimble that he looked at discovery only if he was going to trial. Respondent did not call any other witnesses.

A majority of the trial panel concluded that respondent had committed the 10 violations alleged and imposed a 24-month suspension. A dissenting panel member would have imposed a 12-month suspension.[5]

---

[5] The dissent would also have concluded that, because Wax had been a federal public defender, his opinions regarding the professional standards for public defenders in Oregon state courts should be given less weight. We note, however, that most of Wax's opinions were corroborated by Kimble, an administrator of the consortium of criminal defense lawyers practicing in state courts in Jefferson and Crook counties.

## II.  ANALYSIS

As noted above, respondent contends on review that the Bar failed to prove the allegations by clear and convincing evidence. Respondent makes three arguments: (1) the Karpel evidence was received without a proper foundation; (2) the Bar's allegations rested entirely on Foster's grievance; and (3) by following his client's instructions to resolve cases quickly, respondent did not violate the Rules of Professional Conduct. We reject all three arguments.

Because respondent did not object to the Karpel evidence before the trial panel, his foundation argument is unpreserved. *See generally In re Sanai*, 360 Or 497, 525, 383 P3d 821 (2016) (concluding that issues not preserved before trial panel in lawyer disciplinary proceedings cannot be raised for the first time on review). At no point in the proceedings before the trial panel did respondent raise a foundation objection or otherwise suggest that the evidence from Karpel was inadmissible or unreliable. If he had, the record might have developed differently. *See Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008) (preservation "ensures that the positions of the parties are presented clearly to the initial tribunal" so that the opposing party is not "denied opportunities to meet the argument" (internal quotation marks omitted)).

The foundation argument was central to respondent's contentions in this court, so we will add that, in addition to being unpreserved, we see no basis for excluding that evidence for lack of foundation. The Oregon Evidence Code does not apply to Bar disciplinary proceedings. *In re Ard*, 369 Or 180, 189, 501 P3d 1036 (2021). Trial panels in Bar disciplinary proceedings "may admit and give effect to evidence that possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs." BR 5.1(a). The testimony from Foster and Kimble that prosecutors and defense attorneys in Jefferson County regularly rely on Karpel supports the conclusion that such evidence is "commonly accepted" by reasonably prudent lawyers practicing criminal law in that county. That testimony was sufficient to make the Karpel evidence admissible in this disciplinary proceeding.

We also reject respondent's suggestion that the Bar's case against him rests entirely on Foster's grievance. That grievance—along with the grievances filed by Deitrick, Hooper, and Arthur—certainly may have initiated the Bar's disciplinary investigation, but the presentation to the trial panel ultimately rested on the proffered testimony and exhibits that the trial panel received. As we will explain, reviewing that evidence *de novo*, we agree with the trial panel that the Bar proved by clear and convincing evidence that respondent committed all the violations alleged in the Bar's complaint.

We turn to the specific violations alleged by the Bar.

A.	*RPC 1.1: Failure to Provide Competent Representation*

The Bar alleged four violations of RPC 1.1, related to respondent's representation of the six clients named in the complaint—Arthur, Hooper, Sorensen, Provencher, Williams, and Rivers—all of which the trial panel concluded had been proved by clear and convincing evidence.[6] RPC 1.1 provides:

> "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

This court has stated that whether a lawyer has failed to provide competent representation is a fact-specific inquiry that focuses on the lawyer's conduct without regard to their mental state or the results achieved for their client. *In re Magar*, 335 Or 306, 319-20, 66 P3d 1014 (2003). Our inquiry here, therefore, focuses on the reasonableness of respondent's conduct. *See id*. at 320 (so stating).

---

[6] The second cause of the Bar's complaint—entitled "numerous criminal defense clients"—alleged single violations of RPC 1.1 (competence) and RPC 1.4(b) (failure to adequately explain) in connection with Provencher, Williams, Rivers, and 94 unnamed clients, for which respondent allegedly reviewed only limited discovery, including 37 clients for which he allegedly reviewed no or substantially no discovery. The Bar did not present specific evidence about the facts and circumstances of those clients' cases to the trial panel. For reasons discussed below, we conclude that there is clear and convincing evidence proving the alleged violations with regard to the named clients, making it unnecessary to consider the allegations regarding unnamed clients.

As discussed above, the Bar's four RPC 1.1 allegations focus on respondent's failure to review discovery when representing six different clients, though the Bar only charged four violations: one each as to Arthur, Hooper, and Sorensen, and a fourth violation combining the allegations regarding Provencher, Williams, and Rivers. The Bar contends that a criminal defense lawyer's failure to review discovery before the case is resolved categorically violates RPC 1.1, citing *Bettis*, 342 Or at 240.

*Bettis* involved a lawyer who had not reviewed *any* discovery or conducted *any* legal or factual investigation before seeking a jury trial waiver for a client facing charges for rape and other sexual offenses. 342 Or at 240. We concluded that the lawyer's failure to review any discovery and relevant case information before seeking a jury trial waiver from the client had violated the duty to provide competent representation, under *former* Disciplinary Rule (DR) 6-101(A), the predecessor to RPC 1.1. *Id.* We explained that "no manner of experience or intuition permits a lawyer to seek his or her client's waiver of a fundamental right without first understanding the legal and factual issues in a case." *Id*.

To the extent that the Bar reads *Bettis* to establish a categorical rule that a criminal defense lawyer's failure to review *all* available discovery *always* amounts to a violation of the lawyer's duty of competence, that reading is not quite correct. Determining whether a lawyer has failed to provide competent representation involves a "fact-specific inquiry." *In re Eadie*, 333 Or 42, 60, 36 P3d 468 (2001). For example, a lack of competence may be established when the lawyer lacks basic knowledge or fails to prepare, or the conduct involves a combination of those factors. *See In re Gastineau,* 317 Or 545, 553-54, 857 P2d 136 (1993) (concluding that lawyer violated the duty to provide competent representation by failing to review documents prepared by legal staff and by attempting to file those documents with incorrect filing fees).

Our fact-specific inquiry in this case leads us to conclude that the Bar has met its burden to establish, by clear and convincing evidence, each of the allegations that

respondent did not comply with his obligation under RPC 1.1 to provide competent representation. Beginning with the Sorensen matter, respondent conceded that he had reviewed only the probable cause affidavit before speaking with Sorensen and attempting to resolve her case via plea. In the circumstances of that legal representation, respondent's limited review violated the duty of competence in violation of RPC 1.1. And as explained more fully below in connection with the RPC 1.3 violation, respondent also delayed filing an unopposed motion to determine fitness to proceed, leaving Sorensen in jail for weeks without a mental health evaluation or treatment, and he did not take the actions needed to facilitate a mental health court resolution of her case.

We draw a similar conclusion as to the Arthur matter, which also involved a concession from respondent, in his response to DCO, that he had reviewed only the probable cause affidavit and otherwise spoken only to his client, who ultimately accepted a plea that included his agreement to a 72-month sentence upon revocation of probation.[7] There, respondent claimed that he expended minimal effort because Arthur had wished to enter a plea as soon as possible, to facilitate a quick release from custody. However, the Bar showed that respondent—in addition to failing to review discovery in Karpel[8]—also opted not to interview known witnesses or to confirm with Arthur's probation officer regarding claims that Arthur had made about possible credit for time served. Collectively, those failures violated RPC 1.1.

The combined allegation involving Provencher, Williams, and Rivers also involved plea deals accepted before respondent had reviewed all the available discovery.

---

[7] Powers testified that Arthur's probation later was revoked, and he was facing a 72-month sentence based on the plea agreement, but Powers intervened, filing a motion to set aside the judgment based, in part, on respondent's failure to review discovery. The trial court ultimately granted that motion, set aside his felony conviction, and entered judgment convicting Arthur of a misdemeanor.

[8] Respondent also claimed before the trial panel that he had quickly reviewed the police report through Karpel on his iPhone, but the Karpel records reflected that respondent neither requested nor accessed discovery—and, as explained earlier, we are persuaded by the Bar's evidence that Karpel recorded whether a defense counsel accessed the discovery even if the lawyer did not download the materials.

We address all three cases, though we note that a violation in any of the cases would be sufficient to establish the violation alleged by the Bar.

Provencher accepted a felony plea that resulted in a 48-month prison sentence. Foster testified that none of the photographs, audio files, or police reports were ever accessed in Karpel, and Powers had located no paper or electronic documents related to that case in respondent's files.

Respondent testified that Provencher had been remorseful and wanted to resolve the case as quickly as possible. It is true that criminal defense lawyers serve as agents of their clients, and it is the client, and the client alone, who can decide to pursue trial or accept a plea. *See* RPC 1.2(a) ("a lawyer shall abide by a client's decision concerning the objectives of representation * * * [including the] plea to be entered" in a criminal matter). However, even though that ultimate decision falls to the client, the role of counsel is to provide competent advice and counsel to the client to enable them to make a fully informed decision. Determining what information is necessary for an attorney to provide competent advice and counsel depends on the context and may vary depending on the nature of the case, the nature and complexity of the charges, whether other charges are, or are about to be, brought in the current jurisdiction or elsewhere, the potential sentence exposure, the client's background and criminal history, and the consequences of entering a plea. For some matters, the individual context may require that, to provide competent advice to the client regarding a decision to pursue trial or accept a plea offer, defense counsel may need to test the case, pursue investigation, explore mitigation evidence, and examine possible legal challenges. The specifics are context-dependent, not categorical. We conclude that RPC 1.1's duty of competence required respondent to do more before advising Provencher about a plea that resulted in a 48-month prison sentence.

Regarding the two Williams felony cases, Foster testified that an audio file was never downloaded in the first case, and no discovery was ever requested in the second case but that the two recordings that were sent had never

been accessed.[9] Respondent testified that he reviewed police reports in both cases, but Powers had located only minimal discovery as to Williams—about 20 pages but no recordings or audio files—in the client files that respondent had turned over to her. Thus, the evidence suggests that respondent likely reviewed at least some discovery, consisting of police reports, although it is unclear if those reports related to only the first case or to both cases. Although only reviewing police reports and talking to the client might amount to competent representation in some cases, the Williams matters resulted in significant prison sentences—13 months and 25 months, respectively—and there is no evidence in the record that respondent investigated any mitigating factors or considered whether any legal challenges were available. On this record, it seems likely that respondent's failure to review all the available discovery in the Williams cases violated RPC 1.1's duty of competent representation. But we need not reach that conclusion as to Williams, because we concluded that respondent violated RPC 1.1 in the Provencher case (discussed above), and we also make the same conclusion in the Rivers case (discussed next).

Rivers entered no-contest pleas to charges of first-degree burglary and other felonies, resulting in a 50-month prison sentence. In that matter, respondent had requested discovery, but Karpel showed that he never accessed that discovery, which had included 152 pages of documents and recordings of statements from Rivers and the alleged victims. Powers testified that respondent's files for Rivers consisted of a single document—the plea offer. Respondent's failure to review any discovery before advising his client to accept a plea offer carrying a 50-month prison sentence violated RPC 1.1.

The Bar's final allegation under RPC 1.1 involved respondent's representation of Hooper at an evidentiary hearing following appellate remand; unlike the other cases, the Hooper case did not involve failure to review discovery (or to review substantial amounts of discovery) prior to entry of a plea. We discuss the Hooper matter in greater detail

---

[9] Foster did not explain what was on those recordings or how they may have been relevant to the Williams cases.

below, in relation to the Bar's neglect allegation under RPC 1.3. 372 Or at 608-09. As will be seen from that discussion, we conclude that respondent's conduct in that matter—in addition to violating RPC 1.3—also violated his duty to provide competent representation under RPC 1.1.[10]

For the foregoing reasons, we conclude that the Bar proved by clear and convincing evidence that respondent's conduct violated RPC 1.1 as to each of the four violations alleged in its complaint.

## B.   *RPC 1.3: Neglect of a Legal Matter*

The Bar also alleged that respondent had committed two violations of RPC 1.3 in connection with his representation of clients Sorensen and Hooper; the trial panel concluded that the Bar had proved by clear and convincing evidence that respondent had committed the violations as alleged. Before this court, the Bar contends that respondent engaged in a pattern of neglect as to Sorensen and neglect of an urgent matter as to Hooper.

RPC 1.3 provides that "[a] lawyer shall not neglect a legal matter entrusted to the lawyer." Neglect is a particular type of competence violation that occurs when a lawyer unreasonably fails to act to protect the client's interest under circumstances that call for action. *Magar*, 335 Or at 320. Neglect "is not interchangeable with negligence[.]" *Id.* at 320-21. The neglect inquiry "is not dependent on the outcome of the matter at issue." *In re Knappenberger*, 337 Or 15, 23, 90 P3d 614 (2004). Determining whether a lawyer violated RPC 1.3 "is a fact-specific inquiry in which, using an objective standard, we assess whether the lawyer acted neglectfully." *Id.* In making that determination, we view "the lawyer's conduct along a temporal continuum," and consider whether that lawyer engaged in "a course of neglectful conduct that reflects a failure to act or failure to act diligently." *Id.* (internal quotation marks omitted). "An isolated

---

[10] We have recognized that multiple violations can arise from the same or similar conduct. *See In re Paulson*, 346 Or 676, 695-97, 216 P3d 859 (2009), *adh'd to as modified on recons*, 347 Or 529, 225 P3d 41 (2010) (lawyer who represented clients during suspension violated both RPC 1.16(a)(1) (failure to withdraw from representation) and RPC 5.5 (unauthorized practice of law)); *In re Long*, 368 Or 452, 463-64, 491 P3d 783 (2021) ("earned on receipt" fees violated both RPC 1.5(a) (charging excessive fee) and RPC 1.16(d) (failing to refund fees)).

incident of negligent conduct does not establish neglect; rather, unethical neglect exists when there is a course of neglectful conduct in the representation of a client." *In re Snyder*, 348 Or 307, 316, 232 P3d 952 (2010); *see also In re Jackson*, 347 Or 426, 435-36, 223 P3d 387 (2009) (violation when lawyer failed to prepare for a settlement conference, failed to submit available dates to an arbitrator, and then failed to respond to two voicemail messages over a six-month period). But this court has also concluded that, if the matter is urgent, even a brief period of neglect may violate the rule. *See In re Meyer (II)*, 328 Or 220, 223-24, 970 P2d 647 (1999) (two-month period of neglect was sufficient to establish a violation, when response to a temporary support order had been due within 10 days, but lawyer delayed over two months in responding, resulting harm to his client).

As to the Sorensen matter, we conclude that respondent engaged in a pattern of neglect. The record shows that, when Sorensen was arrested, she appeared to be delusional, and Foster—who was the prosecutor in that case—therefore told respondent that she would not oppose a motion to determine fitness to proceed and respondent represented to the trial court that he intended to file the motion. At that juncture, even if respondent was unsure whether Sorensen was unable to aid and assist in her defense, the fitness evaluation could have been used for mitigation purposes. Although respondent eventually did file such a motion, it was not filed until almost four weeks after his appointment and 13 days after he told the court he planned to file the motion, leaving Sorensen in jail during that time without any mental health evaluation or treatment. Foster testified that a diagnosis from the state hospital was necessary for Sorensen to participate in mental health court under the plea agreement that Sorensen wanted to take, so the delay in filing the motion also delayed the resolution of the case. Foster further testified that respondent did not review any discovery in Sorensen's case for the entire seven months the case was pending. The case was ultimately resolved with a plea and a mental health court probation.

Before the trial panel, respondent countered that he did not think that Sorensen had any mental illness and that

he could not recall any agreement to pursue mental health court.[11] We conclude that the combination of respondent's delay in filing a fitness-to-proceed motion that the prosecutor would not oppose, his failure to take actions that were needed to pursue an available mental health court option during the seven months the case was pending, and his failure to review the available discovery during that period, amounted to clear and convincing evidence of a course of neglectful conduct over an extended period in the Sorensen matter.

As to the Hooper matter, as noted above, respondent represented Hooper for purposes of an evidentiary hearing following remand from the Court of Appeals. The hearing on remand was to address the admissibility of certain "other acts" evidence shown on video exhibits; the Court of Appeals had directed the trial court to weigh the probative value of the evidence against the risk of unfair prejudice. Respondent had more than three months before the hearing to acquaint himself with the issue on remand, obtain and review the evidence, and obtain from Montague (Hooper's appellate counsel) a supplemental transcript prepared by appellate counsel that was relevant to the issue on remand. Respondent took none of those actions. Montague testified about the importance and urgency of acting promptly on remand, but the transcript of the evidentiary hearing before the trial court reveals that respondent had not reviewed the appellate brief and was unaware of the issues in the case; respondent also ignored his client's repeated attempts to interject that they were using the wrong transcript. The trial court ultimately concluded—in the prosecution's favor—that the disputed evidence had been properly admitted; it therefore reinstated Hooper's convictions and then sentenced him to 90 months in prison.[12]

At the trial panel hearing, respondent testified that he already had known that Hooper would not prevail at the remand hearing, but he denied being unprepared, though he

---

[11] Although respondent testified that he could not recall any agreement to pursue a mental health court resolution for Sorensen's case, we credit Foster's testimony about the availability of mental health court and respondent's delay in accessing discovery and taking the steps necessary to resolve the case through mental health court.

[12] As described earlier, Montague was sufficiently alarmed by respondent's mishandling of the matter on remand that she complained to OPDS.

conceded that he had not reviewed the supplemental transcript from Montague. Respondent's claim that he had been adequately prepared is refuted by the transcript from the remand hearing, which is part of the record in this case. Given the importance of the evidentiary hearing to Hooper's case, and the fact that respondent had three months to prepare for it, his failure to prepare amounted to neglect of a legal matter under RPC 1.3, as alleged in the Bar's complaint. *See generally Meyer*, 328 Or 220 (two-month period of neglect sufficient when case involves a discrete and urgent issue).

In sum, we conclude that the Bar has met its burden to prove its two alleged violations of RPC 1.3 by clear and convincing evidence.

C.   *RPC 1.4(b): Failure to Adequately Explain*

The Bar also alleged three violations of RPC 1.4(b)—as to Arthur, Sorensen, and, as a combined allegation, Provencher, Williams, and Rivers—and the trial panel concluded that the Bar had proved those violations. On review, the Bar contends that respondent violated RPC 1.4(b) when he advised those five clients to accept plea offers without reviewing material discovery.

RPC 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." To support its allegations, the Bar relies primarily on *Snyder*, 348 Or 307, which involved a lawyer's failure to properly inform a client about the risks and weaknesses in his civil case. *See also In re Gatti*, 356 Or 32, 51-52, 333 P3d 994 (2014) (concluding that lawyer violated RPC 1.4(b) by failing to accurately convey information regarding how a settlement would be allocated); *In re Bertoni*, 363 Or 614, 633, 426 P3d 614 (2018) (concluding that the lawyer had violated RPC 1.4(b) by failing to explain to the client how work on cases would be handled or what the client's financial obligations would be).

As to its RPC 1.4(b) allegations, the Bar did not present to the trial panel any evidence of the substance of respondent's communications to the five named clients,

and none of those clients testified. Nonetheless, the serious nature of the charges, combined with respondent's failure to review substantially any discovery in those cases—particularly respondent's failure to review any discovery in the Sorensen, Arthur, Rivers or Provencher cases—leads us to conclude that, because respondent was so ill-prepared and uninformed about the strength of the state's cases, he could not have explained matters to the extent reasonably necessary to permit the client to make informed decisions. We have already concluded that, other than the Williams cases, respondent violated his RPC 1.1 duty of competent representation by failing to review any available discovery before resolving those cases by plea agreement. In this context, those violations also constituted violations of RPC 1.4(b).

Plea agreements, by their nature, require weighing the risks of proceeding to trial against the consequences specified in the plea offer. Without a meaningful understanding of the state's evidence, a defense lawyer may be unable to explain those risks to their client intelligently or adequately. Depending on a client's wishes and other circumstances, an exhaustive review of every page of discovery may not always be required to understand and explain the risks and benefits to the "extent reasonably necessary to permit the client to make informed decisions" about a plea offer as required by RPC 1.4(b), but respondent's conduct fell far below what was reasonably required.

The record here reveals that the Arthur, Rivers, and Provencher cases were all resolved through pleas before respondent had reviewed any of the available discovery. Our review of the record reveals no evidence justifying that action. Rivers and Provencher received lengthy prison sentences pursuant to their plea agreements, and Arthur agreed that he would be sentenced to a lengthy term of imprisonment upon revocation of his probation. Respondent had seven months to review the discovery in Sorensen before attempting to resolve that case.[13] Based on respondent's

---

[13] In the Sorensen case, respondent attempted to have his client plead, but the trial court refused to accept her plea without respondent having taken the steps necessary for Sorensen to participate in mental health court. At the continued plea hearing, Foster objected because respondent had not reviewed any discovery. The case was eventually resolved by another lawyer.

failure to review any of the discovery in those cases, he did not have enough information to adequately explain the risks, consequences, and alternatives to those clients before they entered pleas, resulting in three violations of RPC 1.4(b), as alleged.

D.   *RPC 8.1(a)(2): Failure to Provide Requested Information to DCO*

The Bar alleged that respondent violated RPC 8.1(a)(2) by knowingly failing to respond to DCO's requests for information.

RPC 8.1 provides, in part:

"(a)   *** [A] lawyer in connection with a *** disciplinary matter[] shall not:

"*****

"(2)   *** knowingly fail to respond to a lawful demand for information from [a] *** disciplinary authority [with an exception that does not apply here]."

That rule "requires *full* cooperation from a lawyer who is the subject of a disciplinary investigation." *In re Schaffner*, 325 Or 421, 425, 939 P2d 39 (1997) (emphasis in original; applying *former* DR 1-103(C) (1995), the predecessor to RPC 8.1(a)(2)).[14] *See also In re Long*, 368 Or 452, 464, 474, 491 P3d 783 (2021) (describing a violation of RPC 8.1(a)(2) as "failing to cooperate with Bar disciplinary investigation"). A lawyer's partial cooperation, "such as responding only when and if the matter escalates to [a formal] investigation, reduces the extent of the violation but does not absolve a lawyer" under the rule. *Schaffner*, 325 Or at 425 (citing *In re Haws*, 310 Or 741, 749-51, 801 P2d 818 (1990)). *See also In re Paulson*, 346 Or 676, 695, 216 P3d 859 (2009), *adh'd to as modified on recons*, 347 Or 529, 225 P3d 41 (2010) (lawyer's "initial failure to respond and his later inadequate response violated RPC 8.1(a)(2)").

As described earlier, respondent did respond to DCO's multiple requests for information, but only partially. That is, he initially provided what amounted to general

_____

[14] DR 1-103(C) (1995) provided that a lawyer who is the subject of a disciplinary investigation "shall respond fully and truthfully to inquiries from and comply with reasonable requests" for information by the investigating body.

denials, but he did not respond to DCO's inquiries about specific cases. He did not provide specific responses to the list of 37 cases identified in DCO's request until more than a year after the requests, after the Bar had filed its formal complaint. Collectively, those incomplete and inadequate responses fell short of his obligation to respond to DCO's requests for information.

From the foregoing, we conclude that the Bar proved by clear and convincing evidence that respondent violated RPC 8.1(a)(2). Although he did not entirely fail to respond to the Bar's inquiries, he provided conflicting, incomplete, and delayed responses. As in *Schaffner, Paulson*, and *Haws*, providing a delayed response after the Bar had filed its formal complaint may have reduced the extent of the violation, but it did not absolve respondent for his failure to respond to DCO's specific questions.

E.  *Sanction*

Having concluded that the Bar proved the 10 violations set out in its complaint, we proceed to consider the appropriate sanction. In determining the appropriate sanction, we follow the framework set out in the ABA's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards). *In re Herman*, 357 Or 273, 289, 348 P3d 1125 (2015). Under that framework, we first consider three factors that point to a preliminary determination of the appropriate sanction: (1) the ethical duty violated; (2) the respondent's mental state; and (3) the potential or actual injury caused by that violation. ABA Standard 3.0. Next, we consider any aggravating or mitigating circumstances that are relevant to our determination of the appropriate sanction. *Herman*, 357 Or at 289. Finally, we decide the appropriate sanction in light of this court's case law. *Id*.

1.  *Preliminary Determination*

Following from our discussion above, we conclude that respondent engaged in conduct that violated duties owed to multiple clients to provide competent representation and to act with diligence and promptness. ABA Standard 4.4, 4.5. He also violated the duty that he owed to the public and to the legal profession when he failed to respond to

DCO's inquiries. *See* ABA Standard 5.0, 7.0; *In re Kluge*, 335 Or 326, 349-50, 66 P3d 492 (2003) (failure to respond to disciplinary investigation violates duties owed to the public and the legal profession).

As to the mental state when he engaged in the misconduct at issue, we find that respondent acted knowingly when he failed to respond to the Bar's investigation and when he advised multiple clients to waive their constitutional right to trial and plead to criminal charges without adequately preparing. We further conclude that respondent acted knowingly when he failed to prepare for Hooper's evidentiary hearing on remand and in connection with his representation of Sorensen.[15]

Respondent's conduct caused actual and potential injury to his clients, as well as to the public, the legal system, and the profession. *See In re Hostetter*, 348 Or 574, 600, 238 P3d 13 (2010) ("Under the ABA Standards, injuries caused by a lawyer's professional misconduct may be actual or potential."). For example, respondent's delay in filing an undisputed motion to determine fitness to proceed in Sorensen's case left her languishing in jail for weeks without any mental health evaluation or treatment and delayed her participation in mental health court. His failure to prepare for Hooper's hearing on remand or to respond to Arthur's urgent inquiries regarding his plea agreement undoubtedly caused his clients anxiety and uncertainty, *see Snyder*, 348 Or at 321 (noting that "[c]lient anguish, uncertainty, anxiety, and aggravation are actual injury under the disciplinary rules"), when, as noted above, both clients faced the potential of lengthy prison sentences. Additionally, respondent's failure to respond to the Bar caused actual injury to the public and the legal profession. OPDS, a public agency supported by Oregon taxpayers, spent more than $300,000 to audit respondent's cases attempting to identify and minimize the harm he had caused.

Respondent's actions undermined the criminal justice system, which depends upon competent representation

---

[15] To act "knowingly," an attorney must "be aware of the relevant facts," but knowledge "does not require an attorney's subjective awareness that [they are] violating a rule of professional conduct." *In re Conry*, 368 Or 349, 373, 491 P3d 42 (2021).

of indigent defendants, by failing to provide adequate representation while under contract with OPDS. Although the Bar did not charge separate violations in each of the 37 cases, we conclude as an aggravating factor that there is sufficient evidence in the record that, by failing to review discovery in those cases, respondent exposed those clients to a substantial and unjustifiable risk that he missed mitigating evidence or available legal challenges that might have substantially decreased or altogether avoided their sentences.

Turning to a preliminary sanction determination, the ABA Standards suggest that a suspension is appropriate. For example, suspension is generally appropriate when a lawyer "knowingly fails to perform services for a client" or "engages in a pattern of neglect" that causes injury to a client. ABA Standard 4.4. Competence violations that warrant a suspension typically involve both knowledge regarding the lack of competence and, as here, injury to the client. ABA Standard 4.5. Suspension is similarly appropriate for a lawyer who knowingly fails to follow proper procedure or rules resulting in harm to a client or to the integrity of the legal process. ABA Standard 5.2. Finally, suspension is appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury to a client, the public, or the legal system. ABA Standard 7.0.

2. *Aggravating and Mitigating Factors*

The trial panel identified four aggravating factors: (1) pattern of misconduct, ABA Standard 9.22(c); (2) multiple offenses, ABA Standard 9.22(d); (3) vulnerability of victims, ABA Standard 9.22(h); and (4) substantial experience in the practice of law, ABA Standard 9.22(i). Those aggravating factors are undisputed, and we consider them as well.

The trial panel also identified two mitigating factors: (1) absence of prior disciplinary record, ABA Standard 9.32(a); and (2) personal or emotional problems, ABA Standard 9.32(c). After reviewing the record, we agree that those mitigating factors are present.

Respondent contends that the trial panel overlooked two additional mitigating factors. For the following reasons, we disagree.

He first contends that the panel should have considered the delay in proceedings, citing a three-year delay between DCO's initial inquiry and the trial panel hearing. A delay in disciplinary proceedings can be a mitigating factor under ABA Standard 9.32(j). *See In re McDonough*, 336 Or 36, 45, 77 P3d 306 (2003) (applying that factor when Bar filed formal complaint in 2001 alleging criminal acts, some of which occurred in the 1980s). This court's case law, however, suggests that, when the lawyer is responsible for a significant part of the delay, that factor is not given any weight. *In re Devers*, 328 Or 230, 244 n 7, 974 P2d 191 (1999); *see also Paulson*, 346 Or at 720 (agreeing that no weight in mitigation should be given to the delay in proceedings if respondent was a "significant contributing factor" in the delay). Here, respondent was responsible for a significant part of the delay because he failed to timely and fully respond to DCO's requests for information.[16] Under the circumstances, we do not believe the delay in proceedings is a significant mitigating factor in this case.[17]

Second, respondent argues that we should consider, as a mitigating factor, his administrative suspension under BR 7.1 for failing to respond to DCO. *See* ABA Standard 9.32(k) ("imposition of other penalties or sanctions" listed as a mitigating factor).[18] Again, we disagree. Generally, that factor has been treated as a mitigating factor only when the earlier sanction was imposed by different authorities or jurisdictions for the same misconduct. *See, e.g.*, *In re Griffith*, 304 Or 575, 637, 748 P2d 86 (1987) (applying factor when some of lawyer's indebtedness had likely been reduced by

---

[16] Respondent asserts in his opening brief that the trial panel hearing was originally set at an earlier time but was delayed when he attempted (unsuccessfully) to settle the case so that he could take a job out of state. That evidence was not presented to the trial panel, however, and so it is not properly before us.

[17] In one case, we assumed that a three-year delay between the filing of the initial Bar grievance and the trial panel decision could be a mitigating factor but concluded that the mitigating factors in that case were "substantially outweighed by the aggravating factors." *In re Ramirez*, 362 Or 370, 385, 408 P3d 1065 (2018).

[18] The Bar's Motion for Leave to File Memorandum of Additional Authorities on this issue, opposed by respondent, is denied.

civil judgments against him); *In re Chase*, 339 Or 452, 459, 121 P3d 1160 (2005) (trial panel considered both financial difficulties and other sanctions as mitigating factors when lawyer suspended for failing to comply with child support order). Moreover, the administrative suspension imposed under BR 7.1 would have terminated if respondent had complied with the Bar's request for information. BR 7.1(g). Thus, the length of that suspension was within respondent's control. Respondent did not respond to the Bar's administrative sanction petition at all, and he did not fully respond to DCO's request for information until *after* the Bar filed its formal complaint.[19] Although we agree that, in some cases, an administrative sanction for conduct that also violates RPC 8.1(a)(2) might be an appropriate mitigating factor, we do not think that the Bar's administrative sanction was a significant mitigating factor under the circumstances of this case.

In sum, we agree with the trial panel that only two mitigating factors apply: absence of a prior disciplinary record, and personal or emotional problems that may have affected respondent's practice during the time in question.

3.  *Case Law*

Finally, we turn to our case law for guidance in determining the sanction, and we agree with the Bar that a sanction of 24 months is appropriate. The purpose of a sanction is not to punish the lawyer, but to protect the public. *In re Renshaw*, 353 Or 411, 419, 298 P3d 1216 (2013) (citing ABA Standard 1.1). In general, a single violation of the duty of competence would typically result in a suspension ranging from 30 to 60 days, and multiple violations can result in 30-to-60-day suspensions for each violation. *See, e.g.*, *Bettis*, 342 Or at 241-42 (30-day suspension when lawyer failed to review discovery before advising client to waive jury trial); *In re Roberts*, 335 Or 476, 71 P3d 71 (2003) (60-day suspension for two violations involving neglect and conduct prejudicial to administration of justice); *Knappenberger*, 337 Or at 17 (90-day suspension for two violations, one knowing and one negligent, involving neglect). And this court typically

---

[19] We have emphasized that failing to respond to the Bar's investigation "is not a viable strategy for avoiding sanction." *Long*, 368 Or at 459.

imposes a 60-day suspension for failing to respond to DCO requests. *See In re Miles*, 324 Or 218, 224-25, 923 P2d 1219 (1996) (120-day suspension imposed for two failures to respond to disciplinary inquiry); *In re Schaffner*, 323 Or 472, 481, 918 P2d 803 (1996) (60-day suspension imposed for neglect and additional 60-day suspension for failure to respond disciplinary inquiry); *see also In re Lopez*, 350 Or 192, 194, 252 P3d 312 (2011) (9-month suspension for multiple violations involving failures to adequately explain, neglect, and competence affecting seven separate clients).

After considering respondent's mental state, the duties violated, the injury caused, aggravating and mitigating factors and our case law, we agree with the trial panel that a 24-month suspension is appropriate.

Respondent is suspended from the practice of law for a period of 24 months, effective 60 days from the filing of this decision.